N. Y. Firemen
Insurance Co.
v.
Ely.

THE NEW YORK FIREMEN INSURANCE COMPANY *against*
ELY & PARSONS.

A company
incorporated
for the purpose
of insurance,

ASSUMPSIT against the defendants as first endorsers of a
promissory note, drawn by Sturges & Sherman in favor of

and forbidden to carry on any other trade or business, also forbidden to exercise banking
powers, with a clause in the act incorporating them, enumerating the kind of securities
upon which they may loan moneys, but not including promissory notes in such enumera-
tion, have no power to loan moneys upon promissory notes, or on any securities other than
those specially enumerated.

The New York Firemen Insurance Company had no power to loan money on note or other
personal security, under their act of incorporation of 1810; nor have the same company
this power under their act of incorporation of 1818.

Notes taken by either of these companies, upon a loan of their moneys, are therefore,
void.

Neither had power, by their act of incorporation, to discount notes.

Whether, if they had this power by their act of incorporation, it was taken away by the
general restraining acts forbidding to associations, or individuals, the exercise of banking
powers, &c.? *Quære.*

Whether, where one corporation is appointed by statute to settle the concerns of
another and former corporation, which is dissolved, the latter is prohibited, by the restrain-
ing acts, from employing the funds of the former in discounting notes? *Quære.* (Vid.
Laws, sess. 38, ch. 116, sess. 41, ch. 16, sess. 27, ch. 117, sess. 27, ch. 110, s. 8, 9, 2 R. L.
234.)

Opinion of Sutherland, J. that to bring a corporation within the restraining act, their funds
should be devoted principally to the business of banking; and that a single act of loaning
money on bank discount of a promissory note, followed by several successive renewals of
that note, on the same discount, would not be sufficient evidence to show that a corporation
had violated the restraining statute.

Opinion of Savage, Ch. Justice, that the latter would be a violation of the restraining
statute.

A corporation is a mere political institution, a creature of the legislature, having no other
powers than what are given to it by its creator, or such as are incidental or necessary to
carry into effect the purposes for which it was established.

Definition of the terms, "*banking powers.*"

*Casting interest,* upon the principle, that 30 days are the 12th of a year, 60 days the 6th,
90 days the fourth of a year, and the three days of grace the tenth of a month, and discount-
ing a note upon such a calculation, is usurious; and the note, consequently, void.

*The right to take interest in advance on discounting a note,* is not confined to banks, bank-
ers, and merchants discounting bills in the fair course of commercial business, but extends
to individuals, and others having a general right to discount.

The rule is this: Taking interest in advance is allowed for the benefit of trade·; though it
exceed the legal rate of interest. The instrument thus discounted, must be such as will and
usually does, circulate in the course of trade, viz a negotiable instrument, and payable at
no very distant day. Under this restriction, taking interest in advance, either by a bank, an
incorporated company without banking powers, or an individual, is not usurious.

A usage among banks to cast interest at a year for 360 days; one-half of a year for 180
days; one-quarter of a year for 90 days; one-sixth of a year for 60 days; and the three days
of grace at one-tenth of a month, would not prevent its being usurious, though such usage
were universal.

The legal year is 365 days; the legal half-year 182 days, and the legal quarter 91 days,
the law paying no regard to the odd hours.

A statute cannot be abrogated or controlled by the custom or usage of a particular
trade.

the defendants, and endorsed by them and Bennet, Cady & Co. The note was dated 6th July, 1819, payable ninety days after date, for 3450 dollars. The cause was tried before his honor, (the late) Chief Justice Spencer, at the sittings in New York, the 15th June, 1821.

William M'Neil, a witness for the plaintiffs, proved the hand-writing of the drawers and of both the endorsers, and also that there had been a payment on the note of 500 dollars, and that the amount which would be due on the 9th of August, (then) next, would be 3330 dollars 96 cents. The protest and regular notice of non-payment to the defendants being admitted, the plaintiffs read the note, and rested.

William M'Neil being cross-examined by the counsel for the defendants, further testified, that he was now, and had been since the year 1810, secretary of the company; that the plaintiffs received the note in question, from Sturges & Sherman, on the 30th of July, 1819, in part payment for two notes held by the plaintiffs, which had lain over, and were protested for non-payment, one drawn by Sturges & Sherman, in favor of, and endorsed by Ely & Parsons for 2250 dollars, at three months, dated 27th March, 1819, and payable on the 30th of June following; the other drawn by Josiah Sturges, in favor of, and endorsed by Ely & Parsons, for 1600 dollars, at three months, dated 3d April, 1819, and payable on the 6th of July following; the two notes amounting together to the sum of 3850 dollars; and that for the balance, viz. 400 dollars, they received Ely & Parsons' note, in favor of Sturges & Sherman, dated 6th July, at sixty days; that interest at the rate of seven per cent. per annum, was calculated on the two notes, which had lain over protested,

To constitute usury, there must be a corrupt agrement.

Payment, and receipt of usurious interest is, *prima facie,* evidence of a corrupt agreement

This may be repelled by showing that it was by mistake.

Examples of mistake; miscast; miscount of money, &c.

But the adoption of an erroneous principle of calculation, which gives more than 7 per cent. per annum, and receiving the discount or interest, according to that principle, is usury, though the lender believe that he has a legal right to do so.

The former is a mistake of the fact; the latter of the law.

An agreement to pay more than legal interest, through ignorance of the law, is void.

Whether there be a corrupt agreement, so as to constitute usury, is a question of fact; but where the facts are proved beyond dispute, the law fixes the intent.

This distinction considered and illustrated.

NEW YORK,
May, 1824.

N. Y. Firemen
Insurance Co.
v.
Ely.

up to the time when the new notes would become due, which interest was *seventy-two dollars and twenty-three cents*, and was paid, in cash, at the time of taking the new notes ; that the plaintiffs accepted the new notes in lieu of the protested ones, and gave them up. The witness further testified, that he was in the habit of calculating interest in the following manner, viz. to consider 30 days as the 12th part of a year, 60 days as the 6th, and 90 days as the fourth of a year, to charge ½ per cent. for 30 days, 1 per cent. for 60 days, and 1½ per cent. for 90 days, and to add to the product in each case, ⅙ to make 7 per cent. ; that the 3 days of grace were calculated in the same ratio, that is to say, 1/10 part of the amount for 30 days ; that the company had never given him orders to make his calculations in that way ; but it was his usual mode of calculating, and known to be so by the company, and he believed it to be the usual course in other companies, and the common mercantile practice.

The counsel for the defendants then stated to the Court, that they wished to trace the origin of the notes before described, and for which the note in this suit was given, that is to say the notes for 2250 dollars and 1600 dollars, and for that purpose asked the witness what those notes were given for? The witness replied, that the note for 2250 dollars was given in part payment of a note of Sturges & Sherman, in favor of Ely & Parsons, for 2500 dollars, dated 24th December, 1818, at three months, which had been discounted by the office, at 7 per cent. ; that the discount paid was 45 dollars and 21 cents ; that this was the first time they had Ely & Parsons' name ; that the note for 2500 dollars was given in part payment of Josiah Sturges' note in favor of and endorsed by Smith and Hubbell, for 3000 dollars, dated 22d September, 1818, at 90 days; that the discount on this note was 54 dollars and 25 cents ; that he could not continue the chain of this note any farther back. Being questioned as to the note for 1600 dollars, he replied that it was given for, and discounted, to take up a note of Josiah Sturges, in favor of and endorsed by Ely & Parsons, for 1800 dollars, dated 31st December, 1818, at 90 days ; that he considered it a renewal ; that the note for 1600 dollars was dated

3d April, 1819, payable at 3 months; that the discount ta-
ken was 28 dollars and 94 cents; that the note for 1800
dollars was discounted, and the discount taken was 32 dol-
lars and 55 cents, and was given in renewal of a note of
Josiah Sturges, for 2000 dollars, dated 30th September, 1818,
at 90 days, which was also discounted, and the discount was
36 dollars and 17 cents for 93 days. The $2000 note was
discounted, and was given for one of the same amount,
drawn by Josiah Sturges, dated 27th May, 1818, at 4 months;
that the discount on this note was 47 dollars and 84 cents
for 4 months and 3 days; that the last mentioned note was
discounted and given in renewal of one for the same amount,
by the same drawer, dated 24th January, 1818, also at 4
months, on which the discount for 4 months and 3 days was
47 dollars and 83 cents, and this last note was a renewal of
another discounted note of the same amount, given by the
same drawer, dated 22d September, 1817, also at 4 months,
on which the discount was 47 dollars and 84 cents for 4
months and 3 days. The witness also said, that the origin
of both the notes, for 2250 dollars and 1600 dollars, was a
lending of money by the company to Sturges & Sherman,
whose notes were discounted for the purpose, and continued
by renewals, down to the one on which this suit is brought;
and that the money for which those two notes were given be-
longed to the old company, and that an account for the con-
cerns of the old company was kept in the Bank of America,
separate and distinct from the new. The witness, being
again examined on the part of the plaintiffs, stated in further
explanation of the mode by which the interest was calculated,
that when a note was payable in months, it was calculated
the same way, 2 months making $\frac{1}{6}$ of a year, 3 months $\frac{1}{4}$ of
a year, and considering 30 days as one month; that if any
error was made in calculation, it was always corrected in
his book. The witness again stated, that the mode detail-
ed was the common mercantile mode of calculating interest,
and the same pursued in all the banks; but this evidence,
as to the common usage and practice of banks, was objected
to, and received subject to the objection.

NEW YORK,
May, 1824.

N. Y. Firemen
Insurance Co.
v.
Ely.

NEW YORK,    Upon this testimony, the jury, under the direction of the
May, 1824,   late Chief Justice, found a verdict for the plaintiffs, for 3330
N. Y. Firemen dollars, and 96 cents damages, and 6 cents costs, subject to
Insurance Co.
    v.       the opinion of the Supreme Court on a case to be made, with
   Ely.      leave to either party to turn it into a special verdict or bill
             of exceptions.

The cause was argued at the May term, 1823, by *D. B. Ogden & S. Jones*, for the plaintiffs, and (the late) *J. Wells & T. A. Emmet*, for the defendants.

*D. B. Ogden*, for the plaintiffs. The act of discounting is no more than a loan of money on interest, which is paid in advance, so that the real question is, whether the company have the power to lend money, and take a note in security. Perhaps they have no right to buy notes created for the purposes of discount; but the power to loan on note is implied by the act creating the corporation, as being necessary to carry its object into effect. True, the sole object of the company is to insure. This is declared by the first section of the act, but the manner of doing this is found in other sections. Even if the act had stopped at the first section, premium notes might have been taken on interest, payable at a future time, and the interest might have been taken in advance upon the same principle. By the 5th section, the company are empowered to secure debts, *due in any manner whatever*, by mortgage, which plainly implies that they are not confined to premium debts. If they may have debts, then why not as well on promissory notes as otherwise? The opinion of this Court, in *The People v. The Utica Insurance Company*,(a) was, that the surplus funds of the company might be loaned at interest. Ch. Justice Thompson,(b) says there is no doubt of this; and he gives a construction to the act, creating that company directly applicable here. " The second section of the act, (says the Ch. Justice,)(c) prohibits the loaning for certain specified purposes, but the loaning for any other purpose, and in any other way not prohibited by law, is authorized and included in the general power to invest the surplus capital; and under the 12th section they have a right to take and hold mortga

(a) 15 John. 358
(b) Id. 384.
(c) Id. 384, 385.

ges to secure such loans ; for this section expressly declares, that they shall have the right so to do, to secure the payment of any debt which may become due to the corporation, by any means whatsoever. A bond or note given to the corporation, on a loan of money, creates a debt due to them, and the payment may be secured by mortgage, by the express authority here conferred." *Broughton* v. *The Salford Water Works*,(*d*) was cited against us in the last cause. That was not an action by, but against a corporation. Their counsel contended that they were not bound, because a corporation can be holden by no contract not under their corporate seal. This question was not passed upon by the Court, but is now definitively settled in this state,(*e*) against the position of the counsel. They next contended that the acceptance was void, as being contrary to several acts of parliament, made for the protection of the Bank of England, by whose charter all other corporations are forbidden to loan on bills at less than 6 months; and it was on the latter ground that a majority of the Judges decided in favor of the defendants. But we have no statute prohibiting loans by a corporation.

Suppose the company have violated their charter by taking the note. Though this may be void, yet we may recover for the money lent, as was holden by this Court in the *Utica Insurance Company* v. *Scott*.(*f*) By the restraining act, considered in that case, the note may be void, and the state may claim a forfeiture of the charter, but the defendants cannot object to paying the consideration.

Again : by the new act,(*g*) the old company are gone, for all purposes of insuring. The directors of the new company are, therefore, mere trustees to settle and collect the debts due to the former. Like all other trustees, their powers are unlimited in their nature, and restrained by no statute. In this point of view, the question depends merely upon the general power of trustees over the concerns of their *cestuy que trusts*. Trustees, doubtless, have power, indeed it is their duty to take security for bad debts, by promissory note or otherwise. Their funds must be multiplied. Here are losses, from the nature of the business ; suits are pending, and heavy expenses to be incurred ; and it was their plain duty so

NEW YORK,
May, 1824.

N. Y. Firemen
Insurance Co.
v
Ely.

(*d*) 3 B. & A. 1.

(*e*) *Munn* v. *The Commission Company* 15 John. 44.

(*f*) 19 John. Rep. 1.

(*g*) Sess. 41 ch. 16.

to invest their funds as to produce interest. They might, then, loan on interest, upon promissory notes, at a credit, or in a word, " discount notes." Suppose they have broken their trust, this is a question only between them and their *cestuy que trusts.* Such an objection does not lie in the mouth of the defendants.

*(h)* 2 R. L. 234. 4 Laws, 242, c. sess. 41, ch. 236.

Again : what was the object of the restraining statutes ?*(h)* To prevent associations being formed wholly or principally for banking business—not to prevent other companies from doing any particular act which a bank does. Banks lend money. Does this, therefore, restrain all other persons from lending ? The statutes were levelled against the issuing bank notes merely—not the occasional giving or discounting notes. The latter is not the principal business of a bank. A great share of their business is in receiving deposits. It should, therefore, have been left to the jury, as a question of fact, to say whether here was or was not a violation of the restraining statutes.

*J. Wells,* contra. I shall take but little additional notice of the question examined by the gentleman, beyond what I said upon the same subject, in the cause of these plaintiffs against Sturges.*(i)* It does not follow, that because this company may, by the act, lend on bond, that they may do the same thing upon note. So says the case of the *Utica Insurance Company* v. *Scott,* upon which the gentleman relies. Indeed, the admission that they cannot buy up notes in the market, amounts to the same thing. A discount is but a purchase to every substantial purpose. A. B. who makes a note for the purpose of its being discounted by the company, is bound ; but A. B. who sells and indorses the note of a third person to them, is not bound : there is nothing in such a distinction. I do not understand how this company had the right of lending money at all. Certainly not because the Utica Insurance Company had this right. They had an express authority to do this by their charter. Here is no such authority. All the powers of this company are express and exclusive. The disposal of their surplus funds is directed, and the manner expressly circumscribed ; and we must not be understood to admit that they can loan

*(i)* The next preceding cause.

even upon bond. The power of taking notes for premiums is necessary to effect that of insurance; but the power to discount does not follow, unless we admit the absurdity, that a company may discount its own notes. The 6th section of the old act points out the cases in which they may take bonds and mortgages to secure their debts, so necessary did the legislature deem it to restrain them even in this particular, which evidently relates merely to debts due for stock or insurance. As to the words, *by any means whatsoever*, they are only co-extensive with the powers before given. They are general, words, and never could have been intended to enlarge the authority already specifically granted. Such a construction would authorize all or any means of creating debts; whereas the clause must be taken in reference to the subject matter, and intends lawful means only.

In arguing the case of this company against Sturges, I cited *Broughton* v. *The Salford Water Works*, in order to show the opinions of two Judges on the subject of corporate powers; not to determine the effect of the restraining act. If they were not, because a corporation, liable on a bill, as acceptors, does it not follow, that they could not claim on a bill of which they were payees or endorsers? They have no power to take such a bill; and it is, to them, therefore, a prohibited traffic.

It is said the plaintiffs are general trustees, but they still remain a corporation for every purpose except that of insurance. This will appear, not only from the acts themselves, but from the transactions of the company, appearing in the case. If they are not, a corporation, it furnishes us with another defence in this case. They have no right to the character which they assume, and could not come here as plaintiffs.

As to one of the notes included in the plaintiff's claim, it was, in its origin, a mere loan of money, on a note discounted several months after the old company had ceased to exist. Another had its origin in the same manner, a short time before that event. Now the original law pointed out what was to be done with the surplus funds. They were to be invested in stock. Then these notes are void, inde-

NEW YORK, pendent of the restraining act. Under this act it is equally
May, 1824. void, though not declared so in terms ; for it is the offspring
N. Y. Firemen of a transaction positively inhibited by that statute, and is
Insurance Co. tainted with the original illegality.
v.
Ely.     The note is usurious upon two grounds : 1. From the
manner in which the interest or discount was calculated.
2. From the circumstance of this being taken in advance.

1. The note in question is at 90 days, which is called one
fourth of a year ; the three days of grace being called one
(*j*) 1 R. L. tenth of a month. The statute(*j*) provides, that no person
64. shall take directly or indirectly, for loan of any moneys,
above the value of 7 pounds for the forbearance of 100
pounds, for one year ; and so after that rate, for a greater or
less sum, or for a longer or shorter time. If money be lent
for a year, 7 per cent, only is allowed ; if for 6 months, at
the same rate ; if for one quarter of a year, the same. But
is 90 days a quarter of a year ? It is so only on the princi-
ple with which the plaintiffs set out, that 30 days make a
month. By what rule of law is this ? We have lunar and
calendar months ; the one 28, the other, a different number
of days. If 30 days be the twelfth of a year, then 12 times 30
days are the year ; if not to any other intent, yet the laws
of nature and of man must bend to the purposes of the
money lender. No doubt this practice originated with the
banks, and was, with many of them, perfectly innocent ; in-
terest being at 7, and discounts at 6 per cent. This can af-
ford no authority for continuing the practice among lenders,
with whom both are at 7 per cent. The 3d Dyer, 345, a, pl.
5,(1) tells us, that the legal year is 365 days ; the half year,

(1) A question was moved in the bench upon a condition of re-entry, for
non-payment of rent due at *Michaelmas, or by the space of a quarter of a
year after*, what shall be accounted *a quarter* of a year ? and by the opinion
of the Court, the fourth part of the days of a year, which are 91 days, make
a quarter, and to the 6 hours over, the law pays no regard. And Bend-
lowes showed an extract from an old book of the exchequer, to this end : s.
Note, that every quarter of a year contains in it ninety and one days, which
make thirteen weeks ; and half a year contains 182 days, but the year 365
days, and 52 weeks : the quarter of the year after the feast of Michaelmas,
begins on the 30th day of September, and ends on the 29th day of December ;
the next quarter begins on the 30th of December, and ends on the last day

192, and the legal quarter, 91 days.   This note, payable at months, hangs on the same principle, as well as the three days of grace, which were called the 10th of a month.   The plaintiffs may here again claim the benefit of the maxim *de minimis non curat lex*, in protection of their rights, but the avidity with which a half cent is watched and pocketed by them, shows no want of care on their part.

It will be said the intent was not corrupt; but the intent is matter of legal inference, when once the fact is found. There can be no doubt that the company intended to take the interest of one-fourth of a year, for 90 days.   Even in a special verdict, it is enough that it find the facts, without saying *corrupte agreatum ;(k)* and in every case of mistake which has arisen under the statute, the Court put it upon the ground, that if the party taking the excess know of the mistake, the legal consequence of usury would follow.   This was the opinion of Eyre, J. in *Hammet* v. *Yea,(l)* who begins his opinion by saying in so many words, " Where a party on a contract for a loan intentionally takes more than £5 per cent. per annum, for forbearance of that loan, he is guilty of usury."   And in *Marsh* v. *Martindale,(m)* Alvanley, C. J. says, " I stated to the jury that if a man agree to take more than 5 per cent. for the forbearance of money, the law declares that such an agreement is corrupt within the statute of Anne, whether the party thought, at the time that he was acting contrary to the statute or not."   The *Maine Bank* v. *Butts,(n)* bears a strong resemblance to the one before the Court.   The notes of that bank being at 63 days, would be payable at the end of the  ninth week ; but they were in the habit of receiving renewed notes the week before, charging interest for 9 weeks ; thus allowing, in fact, only 8 weeks.   Though this was merely for the convenience of calculation, and the bank had no intention to violate the law, yet when the question came up, the Supreme Court of Massachusetts declared the practice usurious.   Sewall, J.

NEW YORK,
May, 1824.

N. Y. Firemen
Insurance Co.
v.
Ely.

(*k*)  *Roberts*
v.   *Trenayne,*
Cro.  Jac. 507,
8.

(*l*)  1 B. &
P. 144.

(*m*) 3 B. &
P. 154, 159.

(*n*) 9 Mass
Rep. 4.

of March ; the third begins on  the first day of April, and ends on the last day of June ; and the fourth begins on the first day of July, and ends on the 29th of September ; from which the verses,

*Ter centum, ter viginti cum  quinque dievus*
*Sex horas neque plus, integer  annus habet.*

who delivered the opinion of the Court, concludes in this manner : "It is probable, that in this case there was no intentional deviation on the part of the bank ; but a mistake of their right. This, however, is a consideration which must not influence our decision. The mistake was not involuntary, as a miscalculation might be considered, where an in-tention- of conforming to the legal rule of interest was proved ; but a voluntary departure from the rate. An excess of interest was intentionally taken, upon a mistaken supposition, that banks were privileged in this respect to a certain extent. This was, therefore, in the sense of the law, a corrupt agreement ; for ignorance of the law will not excuse." This case conforms, not only to the English doctrine, but to good sense. Here the intention to take more than legal interest is obvious, and this is evidence of the corrupt agreement. It amounts to usury in judgment of law. The manner of casting interest, disclosed by the case, is peculiar to this country. In England the rule is the same in all banks, public and private. In the last edition of Chitty on Bills, 608, 609 and 610, the Court will see the English tables of interest for years, months and days, which make a distinction between a note payable at 30, 60 and 90, days, and a note payable at 1, 2 and 3 months. The contrary practice, then must have originated in this country ; and we ask whether it is of such an age as to sanction a violation of law ? There is no doubt of the intent to swell the amount of interest beyond what is strictly legal, and the Court cannot relieve against a mistake of the law. Some calculations have been made illustrating what has been said upon this point, which I will procure and hand to the Court hereafter.(2)

---

(2) These were as follows: Statement of the difference between the interest as calculated by the plaintiffs, and as the defendants contend it should have been calculated.

Of the $2250 note.

1st note—$3000, dated 22d Sept. 1818, at 90 days.  Interest     Difference
          · received;                                        $54 25
          Interest on $3000 for 1 year, $210.  Now if 365
          days give $210, what will 93 days give ?  Ans.  53 50   0 75

But, 2. the bare circumstance of taking interest in advance, is usury *per se.* Interest is due in consideration of forbearance on one hand, and the use of money on the other. When money is borrowed for a year, at 7 per cent. the agreement is, that the lender shall part with his £100, and forbear for the year, and that the borrower shall receive and have the use of it for the same length of time. How is this done by discount ? The one who receives it, does this *minus* the interest. The lender parts with no more, and at the end of the year, the former is to pay £100 for £93, and the interest on the latter sum ; whereas he ought to pay but £93, and the interest on that. *Barnes* v. *Worlich.*(o) reported in several different books,( p) establishes the old rule.

NEW YORK
May, 1824.

N. Y. Firemen
Insurance Co
v.
Ely

(o) Cro. Jac
25.
( p) Noy, 41,
S. C. by the title of *Barnes*
v. *Worledge,*
Yelv. 31, S. C
Same title as
in      Croke
Moor. 644, S
C. by the title
of    *Worley'*
*case.*

| | | |
|---|---|---|
| 2d note—$2500, dated 24th Dec. 1818, at 3 mo. Int. rec'd, | 45 21 | |
| Interest that should have been received, | 45 21 | 0 00 |
| 3d note—$2250, dated 27th March, 1819, at 3 mo. Int. rec'd, | 40 68 | |
| Interest that should have been received, | 40 66 | 0 02 |
| Of the $1600 note. | | |
| 1st note—$2000, dated 22d Sept. 1817, at 4 mo. Int. rec'd, | 47 84 | |
| Interest that should have been received, | 47 82 | 0 02 |
| 2d note—$2000, dated 24th Jan. 1818, at 4 mo. Int. rec'd, | 47 83 | |
| Interest that should have been received, | 47 82 | 0 01 |
| 3d note—$2000, dated 27th May, 1818, at 4 mo. Int. rec'd, | 47 84 | |
| Interest that should have been received, | 47 82 | 0 02 |
| 4th note—$2000, dated 20th Sept. 1818, at 90 days. Int. rec'd, | 36 17 | |
| Interest that should have been received, | 35 61 | 0 56 |
| 5th note—$1800, dated 31st Dec. 1818, at 90 days. Int. rec'd, | 32 55 | |
| Interest that should have been received, | 32 10 | 0 45 |
| 6th note—$1600, dated 3d April, 1819, at 3 mo. Int. rec'd, | 28 94 | |
| Interest that should have been received, | 28 92 | 0 02 |

The $2250 and $1600 notes combined, and new note taken,
dated July 6, 1819, at 90 days, for $3450.

| | | | |
|---|---|---|---|
| Interest received on $2250, from 30th June to 7th Oct. 1819, 99 days, | 43 30 | | |
| Interest received on $1600, from 6th July to 7th Oct. 1819, 93 days, | 28 93 | | |
| | | 72 23 | |
| Interest that should have been received on $2250, 99 days, | 42 72 | | |
| Interest that should have been received on $1600, 93 days, | 28 54 | | |
| | | 71 26 | 0 97 |
| Too much interest received, by | | | $2 76 |

The interest was payable half yearly, though the principa.
was not due till the end of the year. Even this was ques
tioned as usurious by two of the Court ; and though the ob-
jection was overruled by a majority, yet the book goes on to
lay down the distinction applicable here. Popham, Gawdy
and Williams, Js. held, that " if he had agreed to take his mo-
ney for the forbearance instantly, when he lent it, that had
made the assurance void ; for then he had not lent the entire
sum for one year, and the other had not had the use of his
money according to the intention of the law. And Williams
said, that he knew upon this difference, it had been so resolv-
ed of late time ; wherefore it was adjudged for the defendant,
*quod querens nihil capiat per breve.* Stevens said he was of
counsel in one Snow's case, where it was adjudged accord-
ingly." The same rule is recognized by the more modern
authorities in England. In *Marsh* v. *Martindale*,(q) the
very question I am discussing arose. The interest had been
received in advance, by way of discount; the Court pro-
nounced it usurious, and the bond by which it was secured
was declared void. By these cases, the general rule is clear-
ly established, though the Court made an exception in favor
of trade. They say, " it certainly has been determined that
such a transaction on a bill of exchange, in the way of trade,
for the accommodation of the party desirous of raising the
money, is not usurious, though more than 5 per cent. be ta-
ken upon the money actually advanced. In such cases, the
additional sum seems to have been considered in the nature
of a compensation for the trouble to which the lender is ex-
posed ; and unless that indulgence were allowed, it might
not be worth while for any merchant to discount a bill."
Such shifts were the Courts driven to, in order to evade the
manifest intention of the statute. This case shows no more,
however, than that they will seek excuses for commercial
paper, discounted in the fair course of trade. But they have
never gone beyond this. The Court, by Chief Justice Al-
vanley, accordingly say in the same case, " If nothing more
has been done, than what always has been done by way of
accommodation among merchants, the transaction was not
usurious ; but the rule must be confined strictly to that sort

(q) 3 B. &
P. 154.

of transaction ; for if the discount be taken upon money with- out the negotiation of a bill of exchange, it will amount to usury." Thus the general doctrine is established, with the exception, which is in favor of bills passed in the ordinary course of commercial business ; that when A. has taken a bill payable a number of days hence, and cannot conveniently wait during the period of credit, he may put himself in funds by cashing the bill at an advance discount. Is this that case ? The whole transaction grew out of a lending originally. Does Chief Justice Alvanley mean that parties may create paper with an express view to a loan, and thus evade the statute of usury ? Can so extraordinary a position be imputed to so learned a Judge ? If the paper be created for this purpose, no matter whether it be sealed or not. It is true that in the *Maine Bank* v. *Butts*,(r) Sewall, J. hints at an exception in favor of banks, to be derived from what is said in the two cases of *Matthews, q. t.* v. *Griffiths et al.*(s) and *Maddock, q. t.* v. *Hammet et al.*(t) He evidently means no more ; for although he tells us that individuals have a like authority, yet the two cases to which he refers, relate to English bankers, who hold the same relation to community, as banks with us. He cannot mean that all individuals, corporate and physical, have the right. Such a relaxation of the principle would amount to a rule in itself. It is confined to private bankers or banks. The case of *Auriol* v. *Thomas*,(u) comes within the exception in favor of trade. Thus we are furnished with the general rule, and its exceptions in favor of banks, bankers and bills negotiated in the fair course of trade. But the plaintiffs disclaim the power of banks and bankers, and the exercise of that power. Here is no negotiation of a bill of exchange. They then stand on the same footing with every other individual in community. We concede certain exceptions, but the plaintiffs do not come within them. It is singular that Blackstone, Justice, should say in *Lloyd, q. t.* v. *Williams*, that he could not perceive the difference between taking interest in advance, or at the expiration of the loan. There is a plain, mathematical, substantial difference : he was mistaken, therefore, and his opinion must be put on the

*Margin notes:*

NEW YORK,
May, 1824.

N. Y. Firemen
Insurance Co.
v.
Ely.

(r) 9 Mass
Rep. 54.
(s) Peak N
P. Rep. 200.
(t) 7 T. R
180.

(u) 2 T R
52.

NEW YORK, ground of an exception in favor of bankers. He fears that
May, 1824. " every banker in London, who takes five per cent, for dis

N. Y. Firemen counting bills, would be guilty of usury." *Fiat justitia* is
Insurance Co. not enough. The practice has, it seems, become so inveter-
v.
Ely. ate, that pruning will not answer the purpose. It must be
plucked up by the roots. But though this may be inadmis-
sible, surely the Court ought not to extend the exception
beyond the fair import of its language. The various modes
of evasion, (for they can be called by no other name,) adop-
ted by the English Courts, are sufficiently numerous. One
was, to take a commission according to the rule recognized
(v) 2 T. R. in *Auriol* v. *Thomas.*(v) It will not do to call it interest;
52. it must be softened by the name of commissions for ex-
change, trouble and other charges. Another mode was, for
a country banker to discount bills of a long date by other
bills of his own, on London, at a short date, deducting the
interest on the former for the time they had to run. Thus
a bill at 30 days is brought for discount, which is taken by
the banker in exchange for his own bill on London, at 10
days, deducting the interest on the former, for the whole
time it has to run. By this operation, he gains the interest
for the 10 days,for the whole time his own bill has to run.
This goes upon the ground of accommodation, convenience,
(w) Hammet trouble and expense of remittance.(w) The very apologies
v. Yea, 1 B. & offered by the Court, for these practices, show that the sta-
P. 144.
tute is violated. It will be seen by the cases of *Matthews,*
(x) Peak. N. *q. t.* v. *Griffiths,*(x) and *Maddock* v. *Hammet,*(y) that the
P. Cas. 200.
(y) 7 T. R. K. B. have not yet gone quite so far as the C. P.
180. No doubt the case of the *Manhattan Bank* v. *Osgood,*(z)
(z) 15 John.
92. will be relied on for the plaintiffs. The answer to that case
is first, that no more than the legal per cent. was taken for
the discount, but in the present case we have demonstrated
that more was taken in point of time. Whatever might
have been the fact, in this respect, it was not made a point ;
nor is it for the plaintiffs on the other ground. It was the
case of a banking company, and comes within the excep-
tions established in favor of banks, whose operations are
confessedly privileged. The Court put the case on the lat-
ter ground. They go upon the English authorities, which
treat the case as an exception.

*T. A. Emmet*, followed the same outline with Mr. *Wells*, supporting the positions he had taken by various additional illustrations, and amplifying and enforcing the arguments of his associate in the able and masterly manner for which he is distinguished. To show that taking interest in advance, or by anticipation is usury, he referred to Comyn's Treatise on the Law of Usury, 91 to 94, as containing a full discussion of this point.

*S. Jones*, in reply. This case differs from the former (*the next preceding case*) but in one particular ; that is, one of the notes has not, in this case, been traced back to its premium origin in the old company ; though it is a matter of fair inference that it originated in the same way with the others. A decision for the defendants would be of most disastrous consequence. The suit is not resisted on the ground of payment, fraud or duress, but mainly that some principle of law has been violated, by a mistake in calculation (for it can amount to nothing else) which in the course of 70 or 80 years, something like two generations, would amount to simple interest.

The first question is as to the power of the trustees to receive the note in question, which is of modern origin, and given 18 months after the old company were dissolved. Whatever want of power was in the old corporation, all defence on that ground is taken away by the new note. The case expressly states that this note belonged to the old stockholders, the *cestuy que trusts* of the fund, which does not all belong to the stockholders of the present company. These trustees have powers in relation to this fund, entirely distinct from the new stock. The last act was passed in order to create this new stock with new stockholders. Their appointment to settle up the concerns of the old company, is like the appointment of commissioners for that purpose. The two duties, and all relating to them, are entirely distinct. This mode of dissolving old, and creating new companies, is not unusual. The act recites that the old company had concluded to wind up their concerns ; and then goes on to create a new company with a new stock.

NEW YORK, A part of the old stockholders become so in the new com-
May, 1824. pany; and a number do not. The powers, then, of these
N. Y. Firemen trustees for the old company, are not corporate; nor are
Insurance Co they restricted to any particluar mode of loaning, or other-
v.
Ely. wise managing their funds. By the very first section, the
*business, concerns and operations* of the old company, *so
far as relates to the original stock*, are declared to be
*closed and discontinued.* By section 5th, the new directors
are to settle up their business and concerns, and distribute
their funds; and they are to have the *charge, management,
liquidation* and *settlement* of the old business. The 6th sec
tion does not continue the original powers to the new corpo
ration in their capacity as *trustees ;* but it brings over the
original powers as to a *new company*, for the purposes of a
business new and distinct from the old. The old funds were
not unincumbered and unembarrassed. The contrary was
the case, so much so that the legislature foresaw a lapse of
years before their concerns could be settled. Indeed, this
arises from the very nature of their business. The great
bulk of house insurances are made for seven years. The *resi-
due* to be distributed cannot be ascertained till all dues are
settled. Hence, they are directed (section 5th) to keep sepa-
rate accounts; and the fund must remain under their man-
agement for an indefinite period of time. Instead of divi-
ding them therefore, it was their duty to employ their funds
till by settling the company concerns, they were prepared to
make the contemplated distribution. The stock market is
fluctuating. Shall they be bound to investments in this
alone ? What hinders their buying a note offered for dis-
count? Did not the legislature intend to confer this power
upon them, as necessarily incident to their authority to set-
tle the old concern in an advantageous manner ? The clause
conferring that authority invests them with general powers
for the purpose, the same as if three individuals by name
had been designated as commissioners, instead of the new
corporation. Whenever an act confers power, it confers
all the means of carrying it into execution. The general
power of contracting and being contracted with, given by
the act, confers the right of making all or any contracts
whatever, including notes and bills. Suppose the same

power had been conferred upon a single individual, who had taken this note, is there any law which would bear out the defence? If such a note should be lost by bankruptcy, it might then become a question in account with the *cestuy que trust;* but no more could be objected against its collection than if received by an ordinary trustee. Then, whatever might be urged against an insurance corporation, ceases as against these mere trustees. As to one of the notes, the trustees found it in being when they came into existence. It originated in 1817, two years before the note in question. It was a debt due to the old stockholders. Now suppose it to have been illegal in its origin, such a defence has been abandoned by the act of giving a new note. It was due in conscience, and, though void, presents a moral consideration. Suppose a note given to the Utica Insurance Company, for a pre-existing debt due to the company; is there any doubt it would be valid, when thus given to an individual capable of enforcing it?

But I am yet to learn that the old company had no right to lend money upon notes. It is said the sole object of incorporation was insurance. Suppose the fund of the company to be $500,000. Having this moneyed capital, it is absurd to say they shall not employ it. Really, it is necessary to their very existence. The creation of such a fund of itself, carries the power of loaning, and cannot be restrained short of a most direct and positive prohibition. The creation of such a company authorizes them to invest their funds in such a way as to create a revenue, instead of a dead deposit. Every company having a fund, necessarily possess this power. Could there be any objection to their taking notes at short dates, so as to secure a prompt and regular return of their funds? The provision in relation to stock, is a restricting clause limiting to investments in a particular kind of stock. So of the clause in relation to real estate and mortgages. The latter is a clause which runs through all the chartered institutions of the country, grounded on the same policy as the English *mortmain* acts. This is the first time, I believe, it has been contended that corpo-

rations cannot vest their funds in *personal securities*, in *chattels* merely, to any extent. The power of taking mortgages is conceded to them. Suppose a note or a bond and mortgage taken for the debt of a stockholder; either would be valid. Premiums to any considerable amount are almost invariably paid by notes; and could they not take a bond and mortgage to secure such a note? What, in either case, would prevent their taking a note, as such security? Or, if a man should offer to pay the money due, and take a loan of it, which amounts to the same thing, would this ceremony of a loan prevent his securing it by note? It is not such a security much the most convenient to them? They want a floating fund. It is necessary to their credit, that this should be on short loans. Is this prohibited? Is it not, on the other hand, allowed upon the conceded ground, that it is necessary to carry the general power into effect? What this necessity is, was fully discussed in *M'Cullock* v. *The State of Maryland,*(a) by Marshall, C. J. in considering the clause of the federal constitution, declaring Congress possessed of power to pass all laws which shall be necessary and proper for carrying into execution the other powers conferred. " It does not import an absolute physical necessity, so strong that one thing to which another may be termed necessary, cannot exist without that other; but no more than that one thing is convenient or useful to another." In a word, the means which are implied, are all those which will carry the power into effect in the most beneficial manner. What public inconvenience or private injury could result from the exercise of the means now in question?

In March, 1815,(b) an act was passed, enabling this company to execute policies of insurance, and *other contracts*, without seal. This shows that the legislature understood them to be able to make other contracts. Then, according to the reasoning of the other side from the case of *Broughton* v. *Salford Water Works*, in B. & A. if they may contract without seal, does it not follow that they may receive contracts without seal?

As to the restraining act, in order to bring a company within its provisions, it must bank. There must be a continued operation, so as to constitute the company a banker. A

(a) 4 Wheat.
Rep. 413.

(b) Sess. 38,
ch. 116, s. 3.

few insulated cases of discount or deposit will not do. No
bank can live by this. There must be a fund created and
devoted to banking purposes. Before the act, every one had
a right to bank. · The statute is a restraint upon the com-
mon law right of the citizen, and should not be carried be-
yond its plain object. If you depart from this, you will be
driven to call every act of discount or deposit an infraction.
You would thus invade every counting-house in the city,
and the operations of every moneyed man in the commu-
nity. One friend cannot intrust another with money, for safe
keeping, because it is a deposit. By the statute (sess. 27,
ch. 110, s. 9) and recital, it will be seen that the chamber
of commerce took alarm at the broad terms used in the res-
training act ; and, on petition, a declaratory act was passed
limiting the meaning of the restraining act to banking pow-
ers properly so called ; or, in other words, to such business
only as incorporated banks "usually do or transact."
Banking is a continuation of discount and deposit. A sin-
gle act is not enough, any more than a single act will con-
stitute any other complex idea. Sufficient should have been
shown, then, to authorize a jury to find that we were exer-
cising banking powers. This was the very point in the
*Utica Insurance Company* v. *Scott.* The act was level-
led at private banks, like that of Mr. Barker. The policy of
England is also to prevent private banking by companies ;
and her statute, (15 Geo. 2, c. 13,) denies a right to more
than six persons to unite and take up moneys on their notes
at less than six months; yet in *Wigan* v. *Fowler and six
others*,(c) co-partners who had thus taken up moneys on
their note, the very distinction for which I contend was
adopted by Lord Ellenborough, who declared that the act
however broad in its terms, should be limited to its object,
which was to protect the Bank of England. It was, there-
fore, aimed at private bankers merely ; though, if a com-
mercial partnership be made a mere color for raising money
by the issue of notes, he agreed that the case would fall
within the prohibition of the statute. We deny that here is
any proof of our acting colorably as an insurance company,
in order to interfere with the banking operations of other
companies.

NEW YORK,
May, 1824.

N. Y. Firemen
Insurance Co.
v.
Ely.

(c) 1 Star-
kie's Rep. 459

NEW YORK,      Upon the question of usury, so long as the decision in the
May, 1824.   *Manhattan Company* v. *Osgood*,(d) remains unreversed, I
N. Y. Firemen shall not raise my voice against it. By that case, the inter-
Insurance Co. est may be taken in advance. It is said to decide nothing
      v.      more than that banks are an exception to the general rule,
     Ely.
             But the same rule most manifestly applies to every individ-
  (d) 15 John. ual, both corporate and natural, as was held in the *Maine*
162.
  (e) 9 Mass.  *Bank* v. *Butts*.(e)  The exception relates to the *paper*, not
Rep. 54.      the *party*.  It is the character of the former, not the latter,
             which is to be regarded.  The notes or bills discounted
             being at short dates, the same evil does not arise from it.

             Should the date be extended, a great and unusual length
             of time, the question might then arise, whether it would not
             be colorable, and intended to evade the statute of usury.

             But usury is averred on other grounds.  We deny, how-
             ever, that here was, in fact, any interest taken upon the
             principle that 60 days is one-sixth of a year, &c., in the
             manner stated on the other side.  One of the notes for which
             this was given, was not made for discount, and it will be
             found, on calculation, if I am not mistaken, that no more
             than strict legal interest was taken on the note immediately
             in question.

             *Wells* said, though this were so, which is impossible
             from the calculation, yet if any one of the original notes
             were usurious, the consideration entering into the present
             note avoids it.  The good notes cannot be severed from the
  (f) 15 John. bad ;  and he cited *Munn* v. *The Commission Company*,(f)
44.           that the note being made and coming into existence by the
             act of discount, is void.

(g) 3 Esp. 22.    *Emmet* cited *Cuthbert* v. *Haley*,(g) in support of the
             position laid down by Wells, that the present note is void
             for usury in the original notes.

             *Jones* said, the good could be separated from the bad note.
             Suppose two notes, one good and the other usurious ;  and
             you incorporate them both in a new note ;  the latter is void
  (h) 9 Mass. only as to the usurious note : and he cited *Bearce* v. *Bar-*
Rep. 45.      *stow*,(h) to show this.

SUTHERLAND, J. The plaintiffs' right of recovery is re-
sisted on three grounds :

1. That the note on which the suit is brought was discounted by the plaintiffs ; that they had no right to discount notes ; and that this note is therefore void.

2. That it was usurious, from the circumstance of the discount, or interest, having been taken in advance.

3. That it was usurious, in consequence of the manner in which the discount, or interest, was calculated.

The discounting of notes is only lending money, and taking notes in payment. Is the power of lending money upon notes either expressly given to this company, or impliedly given from the circumstance of its being necessary to the carrying into effect some power that is expressly given ? If not, the company did not possess the power; for I hold the rule upon this subject to be correctly stated by Chief Justice Thompson, in *The People* v. *The Utica Insurance Company*, (15 John. 383,) "that a company incorporated for a specific purpose, have no rights except such as are specially granted, and those that are necessary to carry into effect the powers so granted. Many powers and capacities are tacitly annexed to a corporation duly created, but they are such only as are necessary to carry into effect the purposes for which it was established. The specification of certain powers operates as a restraint to such object only, and is an implied prohibition of the exercise of other and distinct powers." This doctrine is also laid down by Mr. Justice Bayley and Mr. Justice Best, in their opinions in *Broughton* v. *The Manchester Water Works*, (3 Barn. & Ald. 9, 12.)

It is not pretended that the power of discounting notes is expressly given by the act of incorporation, in this case; nor is it necessary to the carrying into effect any power that is granted. The 2d section of the act incorporating this company, declares it to be created for the *sole purpose* of insurance, and to have power and authority to make contracts of insurance, &c., for such premium or consideration, and under such modification or restriction as may be agreed on between the parties. It may be conceded that the company have authority to take notes for the premiums due to them,

NEW YORK, instead of demanding cash; because the power of giving
May, 1824. credit may be necessary to enable them to make the most
N. Y. Firemen advantageous contract of insurance, and because such pow-
Insurance Co. er is necessarily implied in every authority to contract,
v. where the party making the contract is beneficially interest-
Ely. ed in it, and does not act in the capacity of agent. The
notes thus taken for premiums, might undoubtedly be re-
newed, and the credit in that way indefinitely extended;
but it by no means follows, that because the company may
take notes for the premiums due to them that they may loan
money on promissory notes. It is not necessary, to enable
them to carry into effect any of their powers. If no mode
had been pointed out in the act, in which their surplus capi-
tal should be invested, it might have been argued with some
plausibility, that the power of making such instrument must
necessarily belong to every moneyed corporation. It being
necessary, to enable them to carry into effect, in the most
advantageous manner, their general object, and no particu-
lar mode having been designated, they were at liberty to
adopt any mode not prohibited by law. The making of
loans upon promissory notes, might then, perhaps, have been
justifiable, if it was not prohibited by the restraining act.
But in this case, the 16th section of the act expressly pro-
vides, that it shall be lawful for the corporation to invest
*their capital, or any portion of it, either in the stock
of the United States, or of the individual states ;* thus by
the strongest implication, prohibiting any other mode of in-
vestment, and destroying the inference which might have
resulted from the absence of all regulations upon the subject.

Nor does the authority given to the corporation by the 6th
section, to take mortgages *to secure the payment of any
debt which may become due to them,* justify the conclusion,
that they may create debts by loaning money upon notes;
though it undoubtedly admits that they may have debts due
to them, and this strengthens the argument in relation to
their authority to give credit for premiums.

They have a right, by the 6th section, not only to *buy, but
to sell or transfer United States or state stocks.* Debts,
therefore, may lawfully become due to them upon such sales ;

and it was such debts, and *debts due for the shares or stock* NEW YORK, *of the company, and for premiums,* which the legislature May, 1824. intended they should be able to secure by mortgage.

But it is said that this debt originated in, and belonged to the old company, which was dissolved by the act of February 27th, 1818; that the directors were merely trustees in relation to those funds, and were not bound by the restriction contained in the original act of incorporation. I do not find, in the act referred to, any thing to support this position. It is made the duty of the new directors to *take the charge, management, liquidation and settlement, of the business and concerns of the original stockholders,* upon themselves, to keep separate accounts, and after payment of all debts, &c., to distribute the overplus, &c. These powers are not different or greater than those conferred by the original act. There is no intimation of any authority, to make dispositions or investments of the funds, which did not exist in the old company, or which, as directors of the new company, they had no right to make in relation to the funds of the latter. Their power, as to both, was the same, and they were merely directed to keep the accounts distinct.

I am, therefore, of opinion that, independent of the restraining act, (2 R. L. 234,) the plaintiffs had no authority to discount notes by way of loan.

But admitting that they had, was the transaction in question affected by the restraining act? That act provides, "that no person, unauthorized by law, shall subscribe to or become a member of any association, institution, or company, or proprietor of any bank or fund for the purpose of issuing notes, receiving deposits, making discounts, or transacting any other business which incorporated banks may or do transact by virtue of their respective acts of incorporation;" and declares all notes and securities, for the payment of money, given to any company or association, not authorized as aforesaid, null and void.

The object of this act was to prevent *banking operations* from being carried on by any company or association of men, not expressly authorized by law to bank. The act is viola-

ted whenever a company or association of men create a fund for, and actually apply it to the purpose of *issuing notes, receiving deposits and making discounts,* without authority by law to carry on banking operations. The fund must not only be *applied* to those purposes, but it must be created *for the purpose of being so applied.* What then is the evidence requisite to prove that such was the object of creating the fund? The ordinary and habitual application of the fund to those purposes would be conclusive evidence of the fact. But does an insulated case of discounting a note, by a corporation, ostensibly created for the purpose of insurance, and whose funds are actively and principally employed in that manner, afford evidence that the funds of that company were created, not for the purpose of insurance, but for the purpose of banking? Would a jury be authorized in drawing such a conclusion from such evidence? Assuredly not.

In the case of the *Utica Insurance Company* v. *Scott,* (19 John. 1,) the plea alleged, " that . the fund was created for the purpose of issuing notes, receiving deposits, making discounts, and transacting all other business which incorporated banks may and do transact; and that, in pursuance of such intent, &c., the plaintiffs established an office or banking house, and issued notes, received deposits and made discounts." Here the offence is fully set forth, and I apprehend, that in order to bring a case within the restraining act, it is necessary to prove the substantial allegations contained in this plea. The opinion of Mr. Justice Spencer, in the case of *The People* v. *Utica Insurance Company,* (15 John. 394,) is very strong and explicit on this point.

In the case now under consideration, the plea is simply non-assumpsit, and there is no evidence that the plaintiffs have ever discounted any other note than that on which this suit is brought, (and those of which this is one of a series of renewals,) or done any other act which appropriately belongs to a banking institution. I am clearly of opinion therefore, that the note in question is not rendered void by the restraining act.

2. Was the note usurious in consequence of the interest having been taken in advance?

In the *Manhattan Company* v. *Osgood*, (15 John. 162,) this Court decided, that discounting a note *by a bank*, at the rate of *seven per cent.* is not usurious : and the same principle is·perfectly settled in England, in relation to bills of exchange, or promissory notes, discounted either by private bankers or individuals *in the regular course of trade.* In *Lloyd, qui tam.* v. *Williams*, (2 Black. Rep. 792,) Blackstone, J. says, " Interest may as lawfully be received beforehand for *forbearing, as after the time has expired for having forborne ;* and it shall not be reckoned as merely a loan for the balance." In terms, this position is applicable as well to interest taken in advance upon bonds, as upon bills of exchange and promissory notes; but it is qualified and limited by the cases which he cites to illustrate it. *Else, he says, every banker in London, who takes 5 per cent. for discounting bills, would be guilty of usury.*

In *Marsh* v. *Martindale*, (3 Bos. & Pull. 158,) Lord Alvanley expressly admits this to be the established law in relation to the negotiation of bills of exchange made in the usual course of trade ; but he held the transaction in that case to be usurious, principally because the bill discounted was a bill *at three years.* He says, " The jury were impressed with a notion that a bill *at three years* was such a bill as no reputable man would discount ; though it was said that some East India bills, at *two years,* had been discounted. Indeed, Lord Chief Justice Eyre seems to have thought that *the length of the date of a bill* was sufficient to afford a presumption that the discount was intended as a cover for a loan. And if we consider the effect of discounting bills at very long dates, the strength of this presumption will be manifest; for if the practice be carried to a great length, the interest will annihilate the principal. I think, therefore, that the discount of such a bill as this, (not coupled with the transaction respecting the annuity,) would have been *almost* sufficient to have afforded a presumption of usury."

The principle to be extracted from these cases, and from a variety of others which might be cited in confirmation of

NEW YORK, May, 1824.

N. Y. Firemen Insurance Co v. Ely.

them, I hold to be this : that the taking of interest in ad-
vance is allowed for the benefit of trade, although, by al-
lowing it, more than the legal rate of interest is, in fact, ta-
ken ; that being for the benefit of trade, the instrument dis-
counted, or upon which the interest is taken in advance,
must be such as *will*, and usually does, circulate or pass in
the course of trade. It must, therefore, be a negotiable in-
strument, and payable at no very distant day ; for, without
these qualities, it will not circulate in the course of trade.
Under these limitations the taking of interest in advance,
either by a bank, or incorporated company without banking
powers, or an individual, is not usurious.

The note in question, therefore, was not usurious upon
this ground.

3. Was it usurious in consequence of the interest having
been calculated upon the supposition that 90 days were the
fourth of a year, and 3 days the tenth of a month ? The
effect of this mode of calculation is, to give to the lender in-
terest for 365 days, upon a forbearance for 360 ; and where
the interest is seven per cent. the amount received, upon this
principle of calculation will exceed the rate allowed by law.
Whether that excess be great or small is unimportant ; for
the least excess is as much usury as the most enormous.

It is admitted by all the writers, and in all the cases upon
this subject, that the intention of the contracting parties is
the principal subject of inquiry, in determining whether a
contract be usurious or not ; for if the intent of the contract-
ing parties be righteous, the contract cannot be within the
statutes of usury. (Ord on Usury, 37.) It is said by Mr.
Justice Gould, in *Murray* v. *Harding*, (2 Bl. Rep. 865,) that
" the ground and foundation of all usurious contracts is the
corrupt agreement." Chief Justice Eyre, in *Hammett* v.
*Yea*, (1 Bos. & Pull. 151,) says, " where a party, on a con-
tract for a loan, *intentionally* takes more than 5 per cent. per
annum for the forbearance of that loan, he is guilty of usu-
ry :" but he adds, " whether more than 5 per cent. is *inten-
tionally* taken upon any contract for such forbearance, is a
mere question of fact for the consideration of the jury and
must always be collected from the whole of the transaction

between the parties ; and it never can be determined that any particular fact constitutes or amounts to usury, till all the circumstances with which it was attended have been taken into consideration.

In pleading usury, a *corrupt agreement* must be alleged, and upon that the issue is taken.  (2 Ch. Pl. 467.  1 Saund. 295, a. n. (1)   Plea, in *Stewart* v. *Mech. & Farm. Bank*, 19 John. 500.)   Where more than *seven per cent.* therefore, is unintentionally received, either through an error in calculation or a mistake in drawing the instrument, the contract will not be deemed usurious. (*Nevison* v. *Whitley*, Cro. Car. 501.  *Booth* v. *Cook*, Freem. 264.  *Bush* v. *Buckingham*, 2 Ventr. 83. *Buckler* v. *Millard*, 2 Ventr. 107.  *Buckley* v. *Guildbank*, Cro. Jac. 678.  *Glassford* v. *Laing*, 1 Campb. 149.)   These cases all go upon the principle, that the *corrupt agreement* is the essence of the offence, and that a party shall, therefore, be permitted to show what that agreement was, and that it has not been correctly expressed in the written contract.

The payment and receipt of usurious interest is, *prima facie* evidence of a corrupt agreement.  (1 Saund. 295, b. in note.)   It must be conceded that more than seven per cent. per annum, was received upon the discount of the note, in this case.   How is the presumption of law, that it was received in pursuance of a corrupt agreement, sought to be repelled ?   Not by showing that the sum paid for interest was greater than the parties intended should be paid; that there was a mistake in telling the money, or that the Clerk who cast the interest, had fallen into an arithmetical error ; but by showing that the excess arose from the adoption of a principle of calculation, which the parties knew would give more than seven per cent. though they believed it was not a violation of the statute.   In other words, the plaintiffs received more than seven per cent. because they believed that they had a legal right to receive more.  If they judged erroneously, it was a mistake in point of law, and not in point of fact ; and unless there be something in the case of usury to distinguish it from all other cases, their ignorance or mistake in relation to the law, can afford them no protection.

I have said that the question of usury is always a question of intent, and the case of *Hammet* v. *Yea* was cited in support of the position. There can be no usury, without an intention to take a greater rate of interest than seven per cent. But it is not necessary to the offence, that there should be *an actual intention to violate the statute.* It may be committed by one who, in point of fact, never heard of the statute. Whether the party intended to take more than seven per cent. by way of interest, is a question of fact, for the determination of the jury. If it be found that he did, it is an invariable inference of law, that it was taken in pursuance of a corrupt agreement, which consummates the offence. In *Hammet* v. *Yea,* it was admitted that more than five per cent. had been received by the plaintiff. It was contended that the excess was not received for forbearance of the loan, but as commission for the remittance of it. Whether it was received by way of forbearance, or of commissions for remittance, was the question of fact for the jury ; and the observations of Eyre, Ch. J. are to be considered with reference to that state of the inquiry. If it had been admitted, that the whole amount received was intentionally received as interest, there would have been nothing for the jury to find. The law would have pronounced it a case of usury.

In *Marsh* v. *Martindale,* (3 Bos. & Pull. 154,) the jury found expressly, " *that the plaintiff did not think he was acting contrary to the statute.*" Lord Alvanley says, " there is nothing in that finding to prevent us from examining this transaction, and declaring *it to be corrupt, if it appear to us to be so in point of law ;*" and the conclusion to which the Court came upon the case, is thus expressed : " *In this case we are of opinion, that sufficient appears to show that the agreement was corrupt in law, whatever the intention of the plaintiff may have been.*"

In the case of the *Maine Bank* v. *Butts,* (9 Mass. Rep. 55,) this principle is very clearly stated. The Court say, " It is probable that in this case, there was no intentional deviation on the part of the bank, but a mistake of their right. This, however, is a consideration which must not influence or

decision. The mistake was not involuntary, as a miscalculation might be considered, where an intention of conforming to the legal rule of interest was proved ; but a voluntary departure from the rate. An excess of interest was intentionally taken, upon a mistaken supposition that banks were previleged in this respect to a certain extent. This was, therefore, in the sense of the law, a corrupt agreement; for ignorance of the law will not excuse."

The *intent* of the parties is a legal inference from established facts. In a special verdict, it is not necessary that the jury should find *that the agreement was corrupt.* They find the facts and circumstances, from which the law infers either that it was or was not corrupt. (*Roberts* v. *Trenayne,* Cro. Jac. 507.)

That the principle of calculation adopted by the plaintiffs, was the one in general or universal use among banks, cannot alter the law of the case. A statute cannot be abrogated by custom or usage of a particular trade. In *Dunham* v. *Gould,* (16 John. 374,) which was also a case of usury, Chancellor Kent says, " the custom of merchants is not applicable to such a case. It is not a matter of trade and commerce within the meaning of the law merchant ; and if there were such a local usage, it would be null and void, and could not be set up as a cover or pretext to trample down the law of the land. The money lenders throughout the country might as well set up a custom of their own, and then plead it in bar of the statute."

Where the law is clear, no usage can control it. (Cro. Eliz. 85. Per Ld. Kenyon, in *Matthews* v. *Griffeths,* Peak. N. P. Cas. 202. *Ex parte Aynsworth,* 4 Ves. 678. Ord on Usury, 59, b. *The King* v. *Major,* 4 T. R. 750.) The statute of usury speaks of years and not of months. Interest is to be at the rate of seven per cent. per annum; that is, at the rate of seven per cent. for 365 days ; for a legal year is 365 days ; the legal half of a year, 182 days ; and the legal quarter, 91 days : the law paying no regard to the odd hours. (3 Dy. 345, a. *The Bishop of Peterborough* v. *Catesby,* Cro. Jac. 166.) The custom or usage of banks or individuals cannot shorten a year to 360 days ; but a different mode of calculating interest on notes payable at 60

or 90 days, and notes payable in 2 or 3 months, is establish ed and practiced. (Vid, Tables in Chitty on Bills, last ed. 608, 9.)

I cannot, therefore, resist the conclusion, that the note in this case was usurious, in consequence of interest having been calculated and taken, upon the principle that 90 days were the fourth of a year.

WOODWORTH, J. concurred, principally, on the ground that the note was usurious,

SAVAGE, Ch. J. This is an action of assumpsit against the defendants, as endorsers of a promissory note, dated the 6th July, 1819, and drawn by Sturges & Sherman.

The defence is, 1. That the note is void, having been discounted on a loan of money by a company who want the legal power to do such an act. 2. If they have such power, that the note is usurious, and, therefore, void.

On the 2d of March, 1810, an act was passed, to incorporate the firemen of the city of New York, as an insurance company. The corporation was created for the sole purpose of insurance against fire, and marine insurance; and they were prohibited from being concerned in any trade or other business: provided that they might purchase United States stocks, or any state stocks, by way of investing their capital; or might receive a transfer of such stocks for the payment of shares or of any debts due to them, either before or after they commenced business. They had also power to sell and transfer these stocks.

By the act of February 27th, 1818, it is recited that the old company had been unfortunate and wished to wind up its concerns, and that a new company were desirous to be incorporated. It was, therefore, enacted, that the business of the old company be closed, and their effects divided among the stockholders, after paying debts. The new company was then incorporated with the power to insure against loss by fire, of houses, buildings and personal property; to make all kinds of marine insurance, and to loan money on bottomry, respondentia, or mortgage of real estate, and *chattels real*; and, generally, to do and perform all matters

and things *relating to the said objects.* They were also
clothed with all the powers of the old company: Provided,
that nothing contained in the act should, in any way, be
construed to grant banking powers. The directors were to
manage the concerns of the old company, of which they were
to keep separate accounts, and after payment of all debts, to
distribute the overplus to the old subscribers and their re-
presentatives.

Such is the authority under which the directors acted:
we will next see what they have done.

The note in question, was given for two other notes,
which were renewals of others. The transaction commen-
ced as far back as September, 1817; and was originally, a
loan of money, by the old company, to Sturges & Sherman,
for which notes were discounted at 7 per cent. payable at 4
months. Those notes were paid by others; sometimes at
90 days, sometimes at 3, and sometimes at 4 months. They
were all discounted by the company at 7 per cent., and the
discount deducted in advance.

The secretary of the company testified, that his practice
had been to cast interest considering 30 days the twelfth of a
year; 60 days the sixth; and 90 days the fourth of a year.
He charged half per cent. for 30 days; one per cent. for 60;
one and a half for 90 days, and added to the product one-
sixth, to make 7 per cent. The 3 days of grace he called
one-tenth of a month. The plaintiffs knew this was his
practice; and such is the usual course in other companies,
and the common mercantile custom.

A corporation is merely a political institution. It can
have no other capacities than such as are necessary to carry
into effect the purposes for which it was established. (1
Kyd on Corporations, 70. 15 John. 383.) It is a creature
of the legislature, and can have no powers but such as are
given to it by its creator, either at the time of its creation or
subsequently, or such powers as are incidental to those
granted. (1 Kyd on Corp. 13, introduction. 15 John. 383.)

The act of 1810 created the company for the sole purpose
of insurance against fire, and marine insurance. Surely the
power of lending money has no necessary connection with

insurance, nor is in any way incidental to insuring. It is, no doubt, very convenient for the company to have their funds productive, and in a situation whence they may be called in on short notice; yet this consideration does not give the power. But the act contains a direct prohibition. "The corporation shall not be concerned in any trade or other business, except insurance, &c. Provided, that they may purchase and hold or sell stocks." Here, then, is the mode pointed out in which they might employ their funds. It appears to me that the old company had no right to loan money, or discount notes, or transact any business except insurance and buying and selling stocks.

I will next inquire, what powers were granted by the act of 1818? By the third section of the act, the new corporation have authority to insure buildings and personal property against fire, and " to make all kinds of marine insurance, and to loan money on bottomry, respondentia, or mortgage of real estate and *chattels real.*" Nothing is said about loaning money upon *personal security,* like negotiable notes; but the proviso declares, that nothing in the act contained, shall in any way be construed to grant *banking powers.*

This act gives powers (not possessed by the old company) to loan money upon securities specified, and it contains a restriction intended to limit those additional powers, by declaring that the legislature does not grant *banking powers.*

What is the meaning of the terms *banking powers,* is next to be ascertained. In *The Maine Bank* v. *Butts,* (9 Mass. Rep. 54,) Sewall, Justice, says, " that expression, (*banking principles,*) if it has any peculiar meaning, is an authority to deduct the interest at the commencement of loans, or to make loans upon discounts, instead of the ordinary forms of security for an accruing interest." Again ; " The principal attributes of a bank are, the right to issue negotiable notes, discount notes, and receive deposits." (Per Spencer, J. 15 John. 390.) Previous to the restraining acts, there was no power possessed by a bank, not also allowed to individuals and private associations. They could, in common, issue notes, discount notes and receive deposits ; the only difference was, that the former were not liable beyond their cor-

NEW YORK,
May, 1824,

N. Y. Firemen
Insurance Co.
v.
Ely.

porate property, while the latter were accountable in their persons, and to the full extent of their private estate. The first restraining act was passed in 1804. It had for its object the guaranteeing to banks a monopoly of the rights and privileges granted to them, which had been encroached upon, or infringed by private associations. This was re-enacted in the revised laws of 1813 ; and in 1818, the legislature found it necessary to pass the act of April 21st of that year, (sess. 41, ch. 236,) which places individuals upon the same footing with private associations, with the same view to a monopoly, by the incorporated banking companies. The first of these acts prohibits the formation of any bank or fund unauthorized by law, " for the purpose of issuing notes, receiving deposites, making discounts, or transacting any other business which incorporated banks may or do transact, by virtue of their respective acts of incorporation." The second prohibits any person, association of persons, or body corporate, from keeping any office of deposite, for the purpose of discounting promissory notes, or carrying on any kind of banking business or operations, which incorporated banks are authorized by law to carry on ; or to issue any bills or promissory notes, as private bankers, *unless thereto specially authorized by law.* Assuming, therefore, what, in my opinion, cannot be controverted, that banking powers consist in the right of issuing notes, making discounts and receiving deposites, and that the business which incorporated banks may do, by virtue of their acts of incorporation, is prohibited to all others unless specially authorized by law,—it follows, conclusively, that both the old and new company have done what they were not only not authorized by their charter to do, but what was absolutely prohibited by the restraining act. This act cannot be evaded by making the note payable to individuals. There was a loan made upon personal security : Notes were discounted by the plaintiffs. The act declares all such notes void. Without examining the question of usury, in my opinion, the defendants must have judgment.

Judgment accordingly.

Bank of Utica
v.
Wager.

NOTE. I ought to have mentioned before, that though the two cases next preceding were argued at May term, 1823, yet the counsel for both parties, understanding that the question of usury, involved in each, would be again argued in the following case, which was then on the calendar, joined in requesting the Court to postpose the decision of the two former, till the argument in the latter should be heard. The Court were pleased to comply with the request. The following cause was argued at the last October term; and all three remained under advisement to the present term. I was, therefore, the less minute in giving the discussions of the learned counsel upon the point of usury, in the two preceding cases; because I found that I had a very full sketch of almost every thing which had been advanced upon this point, in the notes which I had taken of the last argument.

