SHERRY and Others, Heirs, &c., *v.* DENN, on the Demise of THE STATE BANK OF INDIANA.

The application of a person who is not a party to the suit, for a change of venue, need not be sustained.

It was necessary, before the R. Statutes, for a person claiming to be let in to defend in ejectment, to show that his title was connected to and consistent with the possession of the occupant.

The R. Statutes do not require the Court, after the admission of a person as defendant in such action, to sustain a motion to admit other persons as defendants, whose title is not consistent with that of the defendant previously admitted.

It is a sufficient reason for overruling a motion for the admission of such other persons, that it was not shown that they desired to be admitted.

A sale of a decedent's real estate under proceedings of the Probate Court, to which proceedings the heirs were not parties, does not divest the title of the heirs.

In ejectment by a purchaser at sheriff's sale, against a person in possession under the execution-debtor or collusively, the defendant cannot set up an outstanding title in a third person.

The admission of evidence, which could have had no influence on the decision of the cause, cannot be assigned for error.

The circumstance that there are incumbrances on the real estate of a person indebted to the *State Bank of Indiana*, is no objection to a *bona fide* purchase of the property by the bank, subject to the incumbrances, in consideration of its own claim or a part of it.

The said bank recovered a judgment for 2,500 dollars, for the use of the *Indianapolis* branch, against *A.* and others. Several other creditors afterwards recovered judgments against the same persons. These judgments (including that of the bank) amounted in all to upwards of 12,000 dollars. The bank also held a bill of exchange against *A.*, at the time of the purchase hereafter mentioned, for 5,000 dollars. At the sheriff's sale on executions on said judgments, the bank purchased, for the use of the *Lafayette* branch, certain real estate belonging to *A.* for 8,546 dollars and 25 cents. *Held,* that the bank, not in consequence of the bill of exchange, but of the judgment and execution in its favour, was authorized, by the 6th section of its charter, to make the purchase.

Whether in ejectment by the bank, founded on such purchase, the fact (had it existed) that the bank had exceeded its powers in making the purchase, would have been a defence to the suit, *quære.*

ERROR to the *Parke* Circuit Court.

SMITH, J.—This was an action of ejectment brought by the *State Bank of Indiana*, to recover possession of certain land purchased at a sheriff's sale. The action was commenced in the *Tippecanoe* Circuit Court, at the first term of which Court after notice to the tenants in possession, *Samuel A. Huff*, an attorney of the Court, as *amicus curiæ*, objected to the Court's taking further steps towards the trial of the action, on account of the disability of the judges as shown by an affidavit of *John Sherry*. The affidavit states, that the affiant is one of the tenants in possession of the premises described in the declaration, a copy of which had been served upon him, and that one of the associate judges is a stockholder in the *State Bank of Indiana*, and the president judge and the other associate judge are of kin in the degree of brothers-in-law to persons who are stockholders in said bank. The Court overruled the objection, and required that unless some person should be made defendant in the cause, a judgment should be entered by default against the casual ejector. *Hugh Sherry* then appeared by his attorneys, and was made defendant upon entering into the consent rule and filing the usual plea of not guilty. At the next term of the Court, on the petition of the defendant stating his belief that he would not receive a fair trial, owing to the disability of the judges

as stated in the affidavit of *John Sherry*, the venue was changed to the *Parke* Circuit Court.

At the *August* term of the *Parke* Circuit Court, and at the first calling of the cause in that Court, *John Pettit*, an attorney, filed an affidavit made by himself, together with a consent rule and plea, and moved for the admission of certain persons named in the affidavit as defendants in the cause. The affidavit states in substance, that *Mary Burnett*, *Francis Palms*, *Richard Davis*, and *William Davis*, claim to have been, at and before the commencement of this suit, the legal owners in fee-simple of the land in controversy, and that the deponent verily believes the legal title and right of possession to said premises, of the persons above named, are paramount to those of the lessor of the plaintiff, and that they claim title to said premises. The Court overruled this motion, and at the *September* term there was a trial by jury, which resulted in a verdict for the plaintiff. A motion for a new trial was overruled and judgment rendered upon the verdict.

It appears that the plaintiff offered the following documentary evidence upon the trial:

1. A judgment rendered by the *Tippecanoe* Circuit Court on the 9th of *October*, 1837, in favour of the *State Bank of Indiana* and against *John Sherry*, *Montgomery Sherry*, *William M. Sherry*, *Jacob Sherry*, and *Jesse Sherry* for 2,500 dollars.

2. Sixteen other judgments of the same Court in favour of different individuals against the same defendants, amounting in the whole, including the judgment of the bank which was the oldest, to upwards of 12,000 dollars.

3. The executions which had issued upon these several judgments, and the sheriff's returns thereupon, which showed that he had levied them all on the land described in the plaintiff's declaration, namely, sections No. 4 and No. 6 in the *Burnett* reservation, with certain other property, as the property of the execution-defendants; and that on the 9th of *May*, 1840, he sold said sections Nos. 4 and 6 to the *State Bank of Indiana*, for the use of its branch at *Lafayette*, for the sum of 8,546 dollars and 25 cents. The returns further show that the bank had paid the sheriff the sum of 7,630 dollars and 18 cents in cash, and given him two bonds, one

for 646 dollars and 41 cents, and one for 269 dollars and 66 cents, payable to two of the execution-plaintiffs at the expiration of eighteen months from the date of their judgments (the sale under some of the judgments being upon a credit as the law then required), amounting in the whole to the purchase-money bid; and that he had applied 2,501 dollars and 23 cents in cash, and a bond for 205 dollars, given by another purchaser for another tract of land sold upon credit, to the payment of the execution in favour of the bank, and the balance of the purchase-money received from the bank and from other purchasers, to the payment of the younger judgments as far as it would go; the whole being insufficient to pay them all.

4. The sheriff's deed dated the 17th of *August*, 1840, made pursuant to the sale under the executions just mentioned. The indenture is between the sheriff of the county of *Tippecanoe* of the one part, and the *State Bank of Indiana*, for the use of the branch at *Lafayette*, of the other part. It recites the several judgments and executions aforesaid, with the proceedings thereon, and conveys the premises described in the declaration, sections Nos. 4 and 6, to the *State Bank of Indiana*, in consideration of the payment of 8,546 dollars and 25 cents, the sum bid at the sale.

5. A copy of a bond executed by one *James Barnett* to *John Sherry*, for a conveyance to the latter of the premises in controversy on the payment of four notes for 1,250 dollars each; and a copy of a deed from *Barnett* and wife to *John Sherry*, dated the 5th of *December*, 1836, for the same premises in consideration of the payment of 5,000 dollars. These copies were taken from the records of the recorder's office of the county of *Tippecanoe* and certified in the usual manner.

6. A deed from *Jane Sherry*, wife of *John*, dated the 27th of *May*, 1840, releasing and quitclaiming, by and with the consent of her husband who is also a party to the deed, to the *State Bank of Indiana*, for the use of the branch at *Lafayette*, in consideration of the payment of 200 dollars, all her right of dower to the premises in controversy.

7. A bill of exchange, dated the 15th of *January*, 1840, at *Lafayette, Indiana*, for 5,000 dollars, drawn by *John Sherry* and brothers on *John Sherry*, payable to the order of

James Concannon, M. Morgan, Isaac John, Charles A. Raub, R. Nordyke, and James F. Mills, at the Commercial Bank, Cincinnati, and by them indorsed; with a certificate by a notary public, in the usual form, that the bill had been protested for non-payment.

This was all the documentary evidence offered by the plaintiff. The following parol testimony was then introduced:

A. P. Linn, teller of the branch at Lafayette, testified that the bill of exchange above mentioned was always the property of said branch, having been discounted at the time it bears date for the benefit of John Sherry, the proceeds, being the amount of the bill with the interest only deducted, having been paid to him; that it had been sent to the Commercial Bank of Cincinnati for collection, and had been returned protested for non-payment; that it was considered good at the time it was discounted, but in May, 1840, it was believed by said branch to be doubtful, in consequence of reputed liabilities to a large amount incurred by the parties. Some other witnesses testified that the parties to the bill were insolvent at the time of the sale by the sheriff.

It was proved by several witnesses, that the property was bid off at the sale by Joseph S. Hanna, president of the branch at Lafayette, and that the branch had recognized the purchase by paying the purchase-money and treating the property as its own; that there were three principal bidders at the sale who were bidding against each other; that John Sherry was present and appeared anxious that Hanna should become the purchaser. Some of the witnesses inferred from the acts of Sherry and Hanna, the latter appearing to bid by the instructions of the former and having frequent communications with him, that there was an understanding between them that Hanna should bid off the property, but the witnesses did not know of any agreement between them to that effect.

It was also proved by several witnesses, that the Sherry family consisted of Hugh, the defendant in this suit, and his sons John, Montgomery, William, Jacob, and Jesse. The last five constituted a firm under the name of John Sherry and brothers. Their principal business was farming. They occupied the premises in controversy, sections 4 and 6, having

moved upon them in 1833. *Hugh,* the father, was a cripple,
unable to go about or attend to any business, and was sup-
ported by his sons. *John* appeared to be the head of the
family and had the general management and control. *John*
moved upon the premises first; afterwards his father, *Hugh,*
occupied one of the houses of which there were three upon
the land. The witnesses estimate the land to have been
worth, at the time of the sheriff's sale, from 12 to 20 dollars
per acre. There were a grist-mill and distillery on the
sections which had cost large sums of money, but the value of
the premises was thought not to have been materially en-
hanced by these buildings.

*Peter Weaver,* father-in-law of *John Sherry,* testified that
*John* bought the land by his advice; that he, the witness, had
previously had charge of it as agent of *Samuel Hanna* of
*Fort Wayne,* who had requested him to look for a purchaser;
that pursuant to his advice *John Sherry* wrote to *Hanna* and
found that *Barnett* was the owner; that *John* then bought of
*Barnett* and moved upon the premises. After they had been
thus purchased the witness had no further charge of them.

It was also in proof that the judgment in favour of the
bank, upon which the land was sold, was for the use of the
*Indianapolis* branch.

All of the foregoing testimony was admitted, the defendant
objecting at every step in the progress of the cause. The
plaintiff having concluded, the defendant then offered the fol-
lowing evidence:

1. The treaty and schedule thereto, made on the 2d of
*October,* 1818, at *St. Mary's, Ohio,* between the *United States*
by *Jonathan Jennings, Lewis Cass,* and *Benjamin Parke,*
commissioners, and the *Pottawotamie Indians,* by which the
*United States* agreed to grant to the children of *Cakimi,* a
*Pottawotamie* woman and sister to the principal chief of the
nation, viz., *James Burnett, Isaac Burnett, Jacob Burnett,* and
*Abraham Burnett,* two sections of land each, and to *Rebecca
Burnett* and *Isaac Burnett* one section each, some of the sec-
tions to be located at the mouth of *Tippecanoe* river, and the
others at the mouth of *Flint* river; but it was provided that
none of the grantees, or their heirs, should ever sell or con-
vey any of the lands so granted without the consent of the
president of the *United States.*

2. The copy of a record of certain proceedings of the *Randolph* Probate Court, commenced at the *July* term thereof in 1822, upon the application of *Samuel Hanna*, administrator of *Isaac Burnett*, deceased, for permission to sell the real estate of the said *Isaac*. This record shows that the administrator presented an account of the assets and liabilities of the estate, and that thereupon it was ordered by the Court, that he should sell and convey according to law two sections of land, the property of said *Isaac*, for the benefit of the creditors, and make return of his proceedings at the *March* term, 1823; that at the *August* term, 1824, the administrator presented another schedule of the debts and liabilities of the estate, and another entry was made to the effect that it appeared to the satisfaction of the Court, that the personal estate of the said *Isaac* was not sufficient to pay the debts, and that he had at the time of his death two sections of land, granted to him by the treaty at *St. Mary's* (reciting the terms of the treaty before mentioned), and that the land having been surveyed under the direction of the surveyor general, and numbered into lots and drawn for by the Indian agent at *Fort Wayne*, as described by the said surveyor general, two of said lots, Nos. 4 and 6, on the *Flint* river reservation, had been allotted to and drawn as the lots belonging to the estate of the said *Isaac*, and the said administrator was authorized to sell and convey said lots at a price not less than one dollar per acre; that afterwards, at the *August* term, 1826, the administrator again appeared, and another entry was made exactly similar to the preceding, except that the drawing of the lots by the Indian agent is not mentioned, and it is recited that the administrator had, upon petition to the president of the *United States*, received his consent to sell said land subject to the laws of *Indiana*, and that said land had been appraised, to wit, the section located at the mouth of *Tippecanoe* river to be worth 68¾ cents per acre, and that at the mouth of *Flint* river to be worth 50 cents per acre, and the administrator was ordered to sell, at the Court-house door at *Fort Wayne* in the county of *Allen*, the undivided interest of the said *Isaac* in the twelve sections of land aforesaid; that afterwards, at the *February* term, 1827, the administrator made report that he had sold *both*

sections of the land belonging to the estate of *Isaac Burnett* to *James Barnett*, that at the mouth of *Tippecanoe* river for 448 dollars, being 70 cents per acre, and that at the mouth of *Flint* river at 50 cents per acre, amounting to 320 dollars. These sales were approved and the administrator ordered to make conveyances. The petition to the president of the *United States* is set out at length in this entry, and his approval or consent indorsed thereon is in the following words: " Application for the sale of the two sections of land herein referred to approved, subject, however, to the operation of the laws of the state of *Ohio* in such cases *approved.—James Monroe*."

3. Two deeds from *Samuel Hanna*, the administrator, to *James Barnett*, pursuant to the sale above mentioned, one for the section at the mouth of *Tippecanoe* river, and the other for the section at the mouth of *Flint* river.

The defendant then offered some parol testimony. *Jesse Rider* testified that in the spring of 1833, *Hugh Sherry* employed him to do some carpenter's work about a log cabin his sons had put up on the land in controversy; that *John Sherry* and wife and the other sons moved into the cabin and went to work on the said sections, and in the course of that spring, *Hugh Sherry* with his wife and daughters moved into the same cabin with the others. The witness was afterwards employed to do work about the land by *Hugh Sherry*, who, though a cripple and unable to use his hands or feet, was a man of clear head and sound mind and seemed to have control of the family. *Peter Weaver* testified that about twenty-one years before the time of the trial, after *Isaac Burnett's* death, the *Burnett* family had requested him to superintend and take care of all their lands at the mouth of *Flint* creek; that the original reservees were all dead, but that *Nancy Davis*, formerly *Nancy Burnett*, left two children, *William Davis* and *Richard Davis*, who were still residing at *Lafayette* in this state; that two years after he took charge of the *Burnett* reserve for the *Burnetts*, *Samuel Hanna* told him to take charge of the two sections in controversy for him (*Hanna*), which the witness did.

The testimony on both sides as set out in the bills of exceptions is very voluminous, but the foregoing abstract is deemed

Nov. Term,
1847.

SHERRY
v.
DENN.

sufficient for a full understanding of all the questions which are presented to this Court.

The Court below gave a number of instructions to the jury, some voluntarily and some at the instance of the plaintiff. With the exception of those explaining the ordinary rules and principles which govern in the action of ejectment, they relate chiefly to two points: 1. The right of *Hugh Sherry*, the defendant, to set up an outstanding title as a defence; and 2. The right of the bank to become a purchaser of real estate, under the circumstances detailed in the evidence.

With reference to the first of these points, the instructions were, substantially, that if the evidence proved that *Hugh Sherry*, the defendant, came into possession of the premises under *John Sherry*, or by his permission, or collusively with him, *Hugh Sherry* is estopped from setting up an outstanding title in the *Burnett* heirs or any other person, and, in such case, if the *Randolph* probate proceedings are void he cannot avail himself of that circumstance.

As to the right of the bank to make the purchase, the jury was instructed that "the whole circumstances show a right in the bank to purchase;" that the restrictive clauses in the bank-charter were in restraint of the general powers of the corporation, and were not made to prevent the bank from securing a just and *bona fide* debt then due; that *John Sherry* was indebted to the bank, beyond the judgment, to the amount of 5,000 dollars by the bill of exchange, and the bank was not bound to stand by and see his property sacrificed for less than its value and thereby lose its debt; that if the *Sherrys* were indebted to the bank, though such debts were not in judgment, and it became necessary for the bank to buy the lands and advance the amount of the judgments in order to secure such debts, and the purchase in question was made for that purpose in good faith, it is not within the spirit of the restrictions in the charter; and that the bank had a right to purchase on a judgment in its favour, no matter for the use of what branch the judgment was rendered. The Court also instructed the jury to the effect, that if the bank abused its powers in the purchase of real estate, the state might forfeit its charter by the proper process, but that such abuse could not be inquired into collaterally.

These instructions were repeated in various forms. As above stated they embrace the points raised by the plaintiffs in error, and it is, perhaps, unnecessary to copy them at greater length.

The suit appears to have been warmly contested at every step, and numerous errors in the proceedings of the Court below are assigned upon the record.

The first in order is, that the Court erred in refusing a change of venue on the application of an attorney of the Court as *amicus curiæ*. This was not error. The statute relative to the mode of changing the venue in civil cases, provides that when either of *the parties* shall conceive that he will not receive a fair trial, he may petition, &c. The application of a person who is not a party to the suit need not in such a case be entertained.

The next error alleged is, the refusal of the Court to permit the persons named in the affidavit of *John Pettit* to be made defendants. There was no error in this refusal. It has long been the established rule that a person claiming to be let in to defend in ejectment, must show that his title is connected to and consistent with the possession of the occupant. One claiming in opposition to the title of the tenant is not entitled to be admitted a co-defendant with the tenant. 1 Bibb, 128.—2 Cow. 594. It is true the Revised Statutes of this state, ch. 45 s. 35, p. 797, provide that the Court, on application for that purpose, may make the tenant or landlord, *or* any other person, claiming title to the premises, defendant in place of the casual ejector. But in this case one defendant had already been admitted, and it could not have been the intention of the statutes to require the Court to admit every person who might successively appear and claim a title to the same premises, however distinct and unconnected his alleged claim might be with that of the defendant first admitted. Besides, the affidavit does not show that the parties themselves desired to be admitted. The affidavit is not made by the claimants or by *their* agent or attorney, which of itself is a sufficient reason for the decision of the Court.

The other errors assigned may be considered with reference to the instructions of the Court.

1. As to the right of the defendant, *Hugh Sherry*, to set

up an outstanding title in the heirs of the original reservees. The Court did not err in these instructions. The manner in which the defendant came into the possession and the right by which he held, was a proper subject of inquiry by the jury to be determined from the evidence. An execution-debtor cannot set up an outstanding title in a third person against a purchaser at a sale under the execution, 3 Caines' R. 188; neither can a person who comes into possession under the debtor without title or collusively, 10 Johns. 223; and, in general, a claim or title which could not be set up by a person while in possession, cannot be set up by another person who comes into possession under him. 4 Johns. 202.— 7 Cow. 642.—15 Eng. C. L. R. 331.—4 Blackf. 490. It is admitted that the proceedings of the *Randolph* Probate Court are defective; and that the sale made by the administrator could have no effect to divest the title of the heirs of *Isaac Burnett*, they not having been made parties. Nevertheless, the instruction of the Court that if the defendant was in possession under *John Sherry*, the execution-debtor, he could not avail himself of the defects of those proceedings, was right. It was not necessary for the plaintiff to go further back to establish the title of *John Sherry*, the execution-defendant, than the deed from *Barnett* and wife. By the effect of the sale under the execution, the purchaser became substituted in the place of the execution-defendant, and if he had shown that *John Sherry* was in possession only, under colour of title, that was sufficient, and neither *John Sherry*, nor one claiming under him, could avail himself of any defects in his own title to defeat the recovery of the purchaser. 4 Blackf. 490. This is also a sufficient answer to the objection urged against the admission of a copy of the title-bond made by *Barnett* and wife to *John Sherry*. It was unnecessary and could have had no influence in the decision of the case.

2. The most important questions in this case are those which relate to the power of the bank to purchase real estate, under circumstances such as are disclosed by the evidence. By the sixth section of the charter it is provided, that "The real estate which it shall be lawful for said bank to purchase, hold, and convey, shall be," 1. Such as shall be required for its accommodation in the transaction of its business; 2. Such

as shall have been mortgaged to it by way of security for stock, loans previously contracted, or moneys due; 3. Such as shall be conveyed to it in satisfaction of debts previously contracted in the course of its dealings; 4. Such as shall be purchased at sales upon judgments, decrees, or mortgages, obtained or made for such debts.   And it is further provided that the "bank shall *not* purchase, hold, or convey, real estate in any other case or for any other purpose;" and that all such real estate, not absolutely necessary for the convenient discharge of its business, shall be set up, at least once a year, at public sale, and shall be sold if it will bring the amount of the debt, interest, and costs, for which the same may have been bought, received, or taken by the bank, and which shall remain after deducting all profits received therefrom.

It was the evident intention of the legislature, by these restrictive provisions in the charter, to prevent the bank from becoming a speculator in real estate or a large holder of lands, and at the same time to enable it, in case of necessity, to take such property in satisfaction of debts that might otherwise be lost.   In the language of the Court below, it was not the intention of the legislature, to compel the bank to stand by and see the property of its debtor sacrificed for less than its value, and thereby lose its debt.   It is evidently the intention of the several clauses, giving it the power to purchase, to enable it in all cases to prevent such a sacrifice.

Under the third clause the bank might, undoubtedly, purchase property at a fixed price for a former indebtedness, and pay off incumbrances.   Such a course might be necessary; and when property is about to be sold under execution upon judgments in which the bank is not interested, the execution-debtor being also indebted to the bank, we see no objection to the bank becoming the purchaser, if necessary to prevent a sacrifice and secure its own debt, provided the purchase is made *bona fide*, in consideration of its own debt or some portion of it.   There would, in reality, be no difference in principle between a purchase made in this way, and one made of the debtor prior to the sale under execution.   In both cases, it would be necessary for the bank to pay off such liens as the property had become subject to.   But if the purchase be for a sum less than the amount of the judgment-debts, and

Nov. Term, 1847.

Sherry v. Denn.

no part of the debt due to the bank is extinguished either by the purchase or some arrangement with the debtor, it is evident that the bank does not, by such purchase, receive the property in satisfaction of its own debt. This would, at most, be but a speculation with the view of making up a probable loss, by taking the chance of an increase in the value of the property purchased; and whether it be bought as belonging to a debtor of the bank, or to any other person, we see no difference in the principle. We do not think such a purchase comes within the letter, or the spirit and intent, of any of the clauses giving the bank a right to purchase and hold real estate, and therefore the bill of exchange exhibited in evidence adds nothing to the strength of the plaintiff's title. It is, indeed, suggested by the counsel for the bank that by previous arrangement with the debtor, land so purchased might be held for the benefit of the debtor, and as a security merely for the debt due the bank. But in this case, the evidence does not warrant the conclusion that such an arrangement was made.

The next question is, whether the bank could legally purchase real estate at sheriff's sale, upon several executions, the oldest of which was in its own favour, at a greater price than was necessary for the satisfaction of its own judgment. In other words, whether at a sale upon a judgment for 2,500 dollars, setting out of view any other or further debt due, except, perhaps, so far as it may serve to show that the agent of the bank, in making the purchase, though he mistook the proper method of securing that debt, had no intention to violate or misuse the privileges granted by the charter, the bank could purchase property to the value of 8,546 dollars.

Every corporation aggregate has, incidentally, at common law, a capacity to purchase and alien lands to an unlimited extent or amount. 1 Blacks. Comm. 478.—2 Kent's Comm. 281.—Ang. & Ames on Corp. 87. The legislature may, however, limit this capacity; and there can be no doubt that if a corporation be forbidden by its charter to purchase, hold, or convey real estate, a deed made to it pursuant to such purchase would be void. *N. Y. Firemen Ins. Co.* v. *Ely et al.*, 2 Cow. 678.—*Leazure* v. *Hillegas*, 7 Serg. & Rawle, 319. But this would be upon the ground that the corporation, in

such case, had no ability to contract.  If the purchase was not forbidden, or if it was made pursuant to an authority expressly given, the deed would not be void, whatever other consequences might result from the peculiar circumstances of the case.

An important distinction has been made between contracts entered into by corporations in contravention of an express prohibition, or when the power to make them was entirely wanting, and contracts authorized by their charters but which might involve an abuse or misuser of such authority.  In the latter case, it has been held that such contracts will be deemed valid as between the parties, though the state might for such abuse subject the corporation to a forfeiture of its charter. *The Banks* v. *Poitiaux*, 3 Rand. 136.—*Silver Lake Bank* v. *North*, 4 Johns. Ch. R. 370.—*Chester Glass Co.* v. *Dewey*, 16 Mass. 94.—*Potter* v. *The Bank of Ithaca*, 5 Hill, 490.  We do not deem it necessary, however, to place this case upon that ground, though such a distinction is supported by high authority, and if well founded, it would be decisive of the question now under consideration.  The bank purchased at a sheriff's sale, upon a judgment which had been obtained for a debt previously contracted in the course of its business, one of the cases in which it is not only not forbidden, but is expressly authorized, by its charter to purchase.  The only objection which can be made to the transaction is, that a larger sum was bid for the property than the debt due the bank amounted to.  We are not prepared to say that the bank might not, though purchasing within the power given it, so abuse or misuse that power as to become amenable to the state upon a writ of *quo warranto* or of *scire facias;* but upon a careful consideration of the language used in the charter, we do not think we should be warranted in deciding therefrom, that it was the intention of the legislature to restrict it to bid only the exact amount of its own debt; and we are the more readily led to this conclusion by the fact, that while the power to purchase is given in general and unlimited terms, the object which we might suppose the legislature would have had in view by such a restriction, is sought to be attained by other provisions calculated to prevent the bank from holding, for any long period of time, an undue quantity of real estate.

It is objected that the judgment upon which the land was sold was for the use of the *Indianapolis* branch, and that the purchase was made for the use of the *Lafayette* branch. It is well answered to this, that the legal title both to the judgment and the land purchased under it, was shown to be in the state bank without reference to the beneficial ownership of any branch or branches. The branches have no separate existence, but all constitute one entire body corporate known, by the name and style of *The State Bank of Indiana*. The charter does not limit the power to purchase real estate to any particular department of the corporation. That is a matter affecting only its own rights and left to its own internal regulations.

Upon the whole, we are of opinion that the plaintiffs in error have no reason to complain of the instructions or of the result of the trial. The evidence plainly shows that the possession was acquired under *John Sherry*, the execution-defendant, and unless it had appeared that the deed to the bank was absolutely void, the latter was clearly entitled to a verdict.

*Per Curiam.*—The judgment is affirmed with costs.

*W. P. Bryant*, *O. H. Smith*, and *S. A. Huff*, for the plaintiffs.

*R. A. Lockwood* and *H. O'Neal*, for the defendant.