May Term,
1855.

The State
Bank
v.
Coquillard.

The State Bank v. Coquillard.

There can be no usury where there is not a loan.

When a note, in its inception, is a real transaction, so that the payee or promisee may, at maturity, maintain a suit upon it, the transfer of it by indorsement or discount, though beyond the legal rate of interest, is regarded as a sale of the note and a valid transaction.

A. being engaged in the erection of a flouring-mill, and desirous to raise means to complete it, proposed to convey certain lands to the bank for four drafts owned by the bank; and the drafts were accordingly assigned to him, and the land conveyed to the bank. Among the instances where the bank is allowed by its charter to purchase and hold real estate is, where real estate is conveyed to it "in satisfaction of debts previously contracted in the course of its dealings."

Held, that the purchase from A. was not within this clause of the charter.

Held, also, that being in contravention of the charter, the purchase was void.

A contract which contravenes the provisions of a statute is a nullity.

Wednesday,
May 30.

APPEAL from the *St. Joseph* Circuit Court.

Davison, J.—Bill in chancery. In the Court below, *Coquillard* was the complainant and the state bank and one *Horatio Chapin*, the cashier of its branch at *South-Bend*, defendants. The material facts are these:

*Coquillard*, on the 30th of *September*, 1839, was a director in that branch, and also a member of its finance committee, whose duty it was to purchase bills of exchange and promissory notes. On that day, the branch, through said committee, bought four drafts of 2,500 dollars each, dated *August* 22, 1839, drawn by the *Farmers' Bank of Seneca County*, in the state of *New-York*, payable at four months at the *North American Trust and Banking Company*, in the city of *New-York*. These drafts were looked upon by the directors, *Coquillard* being one of them, as extremely doubtful, and were at maturity protested for non-payment. About the 28th of *April*, 1840, *Coquillard* was engaged in the erection of a flouring-mill, near *South-Bend*, and was desirous of raising means to complete the enterprise. He proposed selling the bank promissory notes, with a view of realizing 20,000 dollars; also to convey to her certain lands in the counties of *St. Joseph* and *Lake*, for one-half of the net proceeds of the said four drafts.

In pursuance of this proposition, the parties entered into a written agreement, which stipulated that *Coquillard* was to convey to the bank, by deed in fee, certain tracts of land (describing them,) containing 1,844 acres, and at the same time assign to her 21,000 dollars in good promissory notes, to draw seven per centum per annum from the date of the agreement, viz., the 28th of *April*, 1840, said notes to be selected by a committee of the bank, for that purpose duly authorized, from such as should be offered by *Coquillard*, who bound himself to employ the proceeds of the above property and notes to be received from the bank, in the erection of a flouring-mill near *South-Bend*, and in the purchase of wheat, and for no other purpose. The bank, on her part, agreed to pay *Coquillard* 20,000 dollars, in ten equal monthly instalments, commencing one month from the date of the agreement, if so much should be needed by him in the prosecution of said business, but not otherwise; also to pay him one-half of the net proceeds or avails of the above-mentioned four drafts, which then lay under protest for non-payment, and for the settlement of which negotiations were then going on, &c., and which drafts in all amount to 10,000 dollars. And it was further understood between the parties, that reference for a fuller understanding of the contract might be had to a record of the same spread on the minute-book of said branch bank.

Upon the execution of this agreement, *Coquillard* assigned in blank and delivered to the bank 21,000 dollars in good promissory notes, which drew interest at seven per centum per annum from that date; and in the next *May* he executed and delivered deeds, according to said contract, for the lands therein described. These lands were shown to be worth 7,000 dollars. It was proved that the bank paid *Coquillard* 20,000 dollars, in monthly instalments as above stipulated, which sum, the bill alleges, was a loan from her to him. It is also alleged that the contract upon which he realized the 20,000 dollars was usurious and void, and that the bank represented the four drafts to be

proper and legal, when, in truth, they were fraudulently made, uncurrent and valueless.

These allegations are directly denied by the answers. They deny that *Coquillard* applied for a loan, or that a loan of money was in contemplation of the parties; aver that the notes assigned to the bank had a previous existence, were not made to be discounted at bank, but were offered for sale by him and purchased by her.

Further, the answers allege that when the bank bought the four drafts, and also when *Coquillard* agreed to receive one-half of their net proceeds, he knew as much about the drafts and the abilities of the parties to them, as any other member of the board of directors.

In our opinion, the weight of evidence is in support of the answers.

The Court, on final hearing, declared the contract usurious and void, the purchase of the land to be in violation of the charter of the bank, decreed in favor of the complainant the excessive interest on the 20,000 dollars, and interest on such excess, together with the value of the land, and interest thereon from the date of the contract.

This decree involves two points of inquiry: 1. Was the contract between *Coquillard* and the bank usurious? 2. Was the purchase of the real estate a violation of her charter?

Where there is no loan there can be no usury. This rule is said to be universal. There are, no doubt, "cases which necessarily import a loan; and no disguise, no affectation of sale or barter, can divest them of that character; such, for instance, as a man's selling his own note executed in blank. When these cases occur, the law puts the stigma upon them without further inquiry. The instrument having had no virtual existence until the loan or sale was negotiated, could in no wise be regarded as a transfer of property." *Nichols* v. *Fearson*, 7 Pet. 103. But, in the present case, the notes assigned to the bank had a real existence prior to the contract between her and *Coquillard*. The agreement stipulates that they were to be, and they actually

were, selected from notes then in his hands. "Whenever the note, in its inception, is a real transaction, so that the payee or promisee may, at maturity, maintain a suit upon it, the transfer by indorsement or discount, though beyond the legal rate of interest, shall be regarded a sale of the note, and a valid transaction." 2 Johns. Ch. 60.—3 *id.* 66.—7 Peters 103.

It is said in argument, that the contract upon which the notes were assigned was a mere device to evade the usury laws. If this was true, the case would be with the complainant, because such "device to evade" would, at once, strip the transaction of its character as a sale. But on the face of the deed there is nothing that favors that position. And the only evidence bearing on the point is found in the answer and deposition of *Chapin.* These prove that, at the time of the contract, *Coquillard* was considered in good circumstances, unembarrassed, and could then have obtained money by loan on the usual terms, had he applied for it. He was the owner of 1,844 acres of land, and worth more than 21,000 dollars in good paper. Hence, it would seem, that had he desired a loan, he might readily have found an indorser. Moreover, the evidence is to the point that a loan was not contemplated, but that the notes were sold by *Coquillard* and purchased by the bank.

The appellee contends that a *bona fide* sale of the notes was not intended, because the agreement stipulates that the proceeds of the property transferred should be employed in the erection of a flouring-mill and the purchase of wheat, and for no other purpose. The force of this reasoning is not perceivable. The stipulation, it is true, is unusual; such a provision is not often found in contracts; but it conflicts with no principle of law, and, in our opinion, goes just as far towards proving a sale as a loan. There is nothing in the record from which it can be inferred that the parties intended a loan of money; and there being no loan, there could be no usury in the transaction.

We are next to inquire whether the bank, in the purchase of the land, violated its charter?

Section 6 of an act establishing said bank, provides that

May Term,
1855.

THE STATE
BANK
v.
COQUILLARD.

the real estate which it shall be lawful for the bank to purchase, hold and convey, shall be, 1. Such as shall be required for its accommodation in the transaction of its business. 2. Such as shall be mortgaged to it, by way of security for stock, loans previously contracted, or moneys due. 3. Such as shall be conveyed to it in satisfaction of debts previously contracted in the course of its dealings. 4. Such as shall be purchased at sales upon judgments, decrees, or mortgages obtained or made for such debts. And it is further provided that the "bank shall not *purchase, hold or convey* real estate, in any other case or for any other purpose." R. S. 1838, p. 94.

The land, in this case, it is said, was received by the bank in discharge of one-half of the four drafts described in the contract; that these drafts constituted "a debt previously contracted," and due to the bank; and that the land was, therefore, received strictly within the third clause of the above section. The plain answer to all this is, that *Coquillard* was no party to these drafts; the debt arising upon them was not the result of any dealings between him and her; nor was he, in any event, bound for their payment. The third clause evidently relates to conveyances from the debtor himself to the bank, in satisfaction of his own indebtedness. The construction contended for by the appellant, would allow the bank to purchase real estate *ad libitum*, provided she always paid for it in drafts received in the course of her dealings. This was not the intent of those who made the law. Indeed, it is manifest that the purchase in question was not only unauthorized, but directly in contravention of a prohibitory statute.

It is, however, insisted that though the contract of purchase may conflict with the above section, still, *inter partes*, it was valid, and that its only effect can be to lay the foundation for a *scire facias* by the state against the bank. "An important distinction has been made between contracts entered into by corporations, when the power to make them was entirely wanting, and contracts authorized by their charters, but which might involve an abuse or misuser of such authority." *Sherry* v. *Den*, 8 Blackf. 555.

May Term,
1855.

We think this distinction is well sustained by authority. And the position insisted on would be correct, if the contract respecting the land is not within the prohibitory clause of the section. But the purchase is within that clause. The charter distinctly points out the cases wherein, and the purposes for which, the bank may buy real estate. It will, however, be at once seen that the present contract does not evince a *case* or a *purpose* within either the letter or spirit of the enactment. It was nothing more than an ordinary contract of sale, with an agreement to pay for the land by delivering to the vendor one-half of the proceeds of certain drafts when collected. The law has deprived the bank of any capacity to make such contract of purchase, and the deeds made pursuant to it must be considered absolutely void, on the principle that all contracts which contravene the provisions of a statute, are nullities. *The State, for the use, &c.* v. *The State Bank*, 5 Ind. R. 353.

The decree must be reversed.

*Per Curiam.*—The decree is reversed with costs. Cause remanded, &c.

*J. L. Jernegan*, for the appellants.

*J. A. Liston* and *J. W. Gordon*, for the appellee.