Van Rensselaer Halsey and Others, Individually and as Copartners Doing Business under the Firm Name and Style of C. D. Halsey & Co., Appellants, *v.* Clinton D. Winant, Defendant, Impleaded with W. A. Harriman & Co., Inc., Respondent.

First Department, June 24, 1931.

*Carroll G. Walter* of counsel [*J. Frederick Eagle* with him on the brief; *Patterson, Eagle, Greenough & Day,* attorneys], for the appellants.

*Martin Conboy* of counsel [*John Vance Hewitt* and *Bernard Sobol* with him on the brief; *O'Brien, Boardman, Conboy, Memhard & Early,* attorneys], for the respondent.

Townley, J. The plaintiffs are judgment creditors of the defendant Clinton D. Winant, and bring this action to subject to the payment of their judgment 450,000 shares of the capital stock of Falcon Oil Corporation.

At the commencement of the action, on February 2, 1929, those shares concededly were in the possession of the defendant W. A. Harriman & Co., Inc. (hereinafter called Harriman) as security for a debt of Winant amounting to $2,600,000, and were being advertised for sale at public auction on February 6, 1929, for the purpose of foreclosing the pledge. The complaint alleged that that debt was usurious, that the alleged lien of Harriman upon the stock consequently was void, and it prayed that the sale be enjoined.

A few days after the commencement of the action, Winant and Harriman entered into an agreement, dated February 5, 1929, by which Winant assigned to Harriman " the said shares of stock, and all his right, title and interest therein, in full satisfaction and settlement of the said indebtedness " and released and discharged Harriman from " any and all causes of action, claims and demands whatsoever in law or in equity arising out of or in connection with the said loan or loans."

The making of the assignment of February 5, 1929, is set up in a supplemental complaint in which the plaintiffs allege that the assignment was made with intent to hinder, delay and defraud Winant's creditors. That assignment is claimed to be invalid upon the further ground that it was made *pendente lite* after the plaintiffs had acquired a lien by virtue of the commencement of this action.

A full understanding of these claims requires a statement of the facts leading up to and surrounding the agreement attacked.

The Venezuelan National Petroleum Corporation (hereinafter called V. N. P. C.) was a Delaware corporation organized in 1926 by Winant, an attorney at law and a promoter. The stock was held by Winant, his father and wife, who gave full authority to Winant to deal with their interest in this stock, and it was delivered, after supplementary proceedings, to the plaintiffs as the only asset which Winant possessed.

In April, 1927, V. N. P. C. contracted to buy 280,000 acres of oil lands in Maracaibo Basin, Venezuela, and 90,000 acres of oil lands in Eastern Venezuela at $1,350,000 in cash and $175,000 par value of stock of either V. N. P. C. or of such corporation as might be organized. On May 14, 1927, the Falcon Oil Corporation, another Delaware corporation controlled by Winant, agreed to purchase from V. N. P. C. for 200,000 shares of its capital stock of par value of $10, the concession bought in Venezuela. This concession was purchased from Compania Venezolana de Petroleo.

At about the same time V. N. P. C. agreed to purchase five per cent underlying royalty on three maritime strips along Lake Maracaibo, belonging to Lago Petroleum Corporation, for $2,700,000, of which $1,250,000 was payable in cash on conveyance and the balance in installments of $750,000 and $700,000 respectively. On June 30, 1927, the Falcon Oil Corporation contracted to buy the royalty from V. N. P. C. for $1,250,000 in cash, $600,000 in cash, and 275,000 shares of Falcon stock. To finance the purchase price of these properties 475,000 shares of Falcon Oil Corporation stock were issued as payment for the purchase price to V. N. P. C. Winant acting for V. N. P. C. pledged 475,000 shares of Falcon to J. Henry Schroder Banking Corporation and other banks to obtain the cash to make the payments owed by V. N. P. C. Harriman was a stranger to all these preliminaries.

In December, 1927, Winant approached Harriman to undertake a refinancing of these properties which up to that time had been carried wholly on credit. At that time a loan of approximately $1,250,000, made by J. Henry Schroder Banking Corporation to Winant and secured by a pledge of the entire royalty property acquired from the Lago Company was outstanding. Harriman at the request of Winant, in order to refinance this loan on behalf of Falcon Oil Corporation, underwrote a note issue of $1,200,000 and sold it in the general market. The proceeds of this issue were paid to the Schroder Banking Corporation to satisfy the loan and release the royalty property. This was necessary before any comprehensive scheme of financing could be undertaken. Between December, 1927, and May, 1928, Harriman was attempting to refinance the company.

In May, 1928, Winant disclosed to Harriman that certain shares of Falcon stock were pledged and that $1,400,000 was required to release them. Under date of May twenty-second, an agreement was made by which Harriman advanced $400,000 in pounds sterling against the delivery to Harriman in London of 50,000 shares of the Falcon capital stock and against delivery of $25,000 shares in New York city. On May 25, 1928, a second agreement was made to lend a total of $1,400,000 at six per cent interest, to be repaid within six months, and 350,000 shares of Falcon Oil Corporation stock were pledged as security. This was done under a syndicate arrangement. In both these agreements options to purchase stock were included. After the advance of a total of $1,400,000, Harriman not only continued its efforts to finance the Falcon Oil Corporation and to interest bankers in marketing its shares, but also obtained the assistance of Samuel & Company, Ltd., London, in its attempts. None of these efforts was successful.

In August, Winant informed Samuel & Company, agents for Harriman, that an additional $1,200,000 would be required to make available for sale the aggregate amount of 450,000 shares of Falcon Oil Corporation and to give Harriman an option on the majority of the shares.

On the twenty-ninth of August, therefore, Harriman made the final agreement, which is alleged to be usurious, whereby it promised to lend an aggregate amount of $2,600,000 against interest at six per cent coupled with delivery of 450,000 shares of stock as collateral with a six months' option to buy these shares at $7.50 a share for 350,000 shares, with a renewal privilege at a higher rate, and at $20 per share for 75,000 shares of preferred stock, plus forty per cent of the profits from a new Venezuelan deal that Winant was negotiating. A fee of $6,000 for services in syndicating the loan was also provided. The money was lent under this contract, the debts were paid, and the stock was handed over to Harriman.

It was found by the court that the advance of the amount aggregating $2,600,000 was an incident in the attempts of Harriman and his associates to finance the Falcon Oil Corporation. It was also found that it was not a pretense or cover for usury and that it was not a usurious loan. The court also found that the charge of $6,000 was a service charge for arranging the syndicate.

After August thirty-first further attempts were made to sell the stock or the physical properties. When the loan fell due, a month more was given Winant to take up his loan. Then, payment not having been made, on January fourth Harriman published a notice of sale of the collateral under the Lien Law, reserving the privilege of buying in the stock at the sale. On January twenty-fifth Winant confessed judgment before a notary public on behalf of the plaintiffs for $300,000. This judgment covered a personal claim against Winant on an unpaid draft. Execution was returned unsatisfied. During January, 1929, Harriman had offered the plaintiffs all or any part of its advances and the proportionate shares of stock pledged therefor, which offer was refused. Early in February all of the stock was again offered by Harriman to plaintiffs at the cost to it, and plaintiffs again refused. During the latter part of January Winant suggested transferring all the shares to Harriman in satisfaction of the indebtedness of Winant and the V. N. P. C., but this offer was not accepted. On February fourth plaintiffs informed Harriman that if they held the sale of this stock, plaintiffs would publish an announcement that Harriman could not give a good title.

After the plaintiffs had threatened to protest against the foreclosure sale of the collateral, Winant again offered to transfer the

pledged shares to Harriman in full satisfaction of the indebtedness of $2,600,000 and interest. On the morning of February sixth officers of Harriman determined to accept Winant's offer because of plaintiff's threatened announcement that a purchaser at public sale would not obtain good title. Harriman believed that the announcement would not only destroy any possibility of a sale but would also prevent Harriman from ever recovering the amount of the advances. At the time of the transfer, Harriman knew of no prospective purchasers for the shares and had no intimation that any one would bid for them at the proposed public sale. Winant also desired to avoid publicity. On February sixth, shortly before noon, Harriman withdrew the 450,000 shares from public sale. Winant had already transferred the shares under an agreement dated February fifth to Harriman in full settlement of all the claims. There is a finding by the court that the transfer was made without actual fraudulent intent.

After the transfer of February fifth, various attempts were made to sell the Falcon stock or its assets. Negotiations with the Standard Oil Company of New Jersey in January, 1929, failed. Similar negotiations with the Sinclair Consolidated Oil Company in April, 1929, were of no avail. There was a clause in the royalty contract with Lago whereby Lago could pay either in cash or oil. This provision made it difficult to sell the property to any people who were interested in building up oil reserves. The Lago Petroleum Corporation offered to buy the royalty property for about $1,250,000 without the concessions. In May, 1929, plaintiffs attempted to obtain an option from Harriman, but, in view of the pending litigation, the matter was dropped. In June, 1929, there was an attempt to sell the property to the City Service Company but an offer of $4 per share was all that could be secured. In July, 1929, certain French interests investigated the property without result. Finally, after Harriman negotiated a new contract with Lago Petroleum Corporation eliminating the objectionable clauses at a cost to it of $200,000 in cash, a sale was made to a Spanish company. On this sale Harriman realized about a million dollars in excess of Winant's debt.

The original complaint claimed that the agreement of August twenty-ninth was a usurious agreement because a loan of $2,600,000 with interest at six per cent was coupled with an option agreement permitting Harriman to buy the stock at a specified figure and take forty per cent of possible profits from Winant's further proposed deal with the Venezuelan government.

The test for the determination of a charge of usury is the intent of the parties. The Court of Appeals said in *Clarke* v. *Sheehan*

(47 N. Y. 188, 195): " The mere fact that a loan of money on interest is the consideration for another contract, is not, in all cases, conclusive evidence of usury. If, by the collateral contract, some benefit is secured to the lender, for which the borrower does not receive an equivalent, and which the lender would not have obtained, except for the loan, and which is intended as additional compensation for the loan, it is usury. But, if provision is made for full compensation to the borrower for all he may do under the collateral contract, there is no usury. Usury consists of a corrupt agreement, whereby more than lawful interest is to be paid; and all shifts and devices which may be resorted to, for the purpose of covering up or concealing such an agreement, are ineffectual, if the intent to obtain more than legal interest for the use of the money can be discovered. And even a mistake of law will not protect the lender. [*New York Firemen Ins. Co.* v. *Ely*, 2 Cow. 678.] But, where no such intent exists, refined theories should not be resorted to, for the purpose of making out usury by construction." (See, also, *Browne* v. *Vredenburgh*, 43 N. Y. 195.) It must be also remembered that " the *onus* is upon the party alleging this defense, not merely to establish a usurious intent but to prove the fact from which that intent is to be deduced." (*Thomas* v. *Murray*, 32 N. Y. 605, and cases cited at p. 612.) " A corrupt and usurious agreement will not be presumed from a fact which is equally consistent with a lawful purpose." (*Valentine* v. *Conner*, 40 N. Y. 248.)

This burden of proof has not been borne by plaintiff. We find no reason for disturbing the finding of the court below on this issue. A reasonable analysis of the contract of August twenty-ninth shows a loan of money at the legal rate of interest coupled with an option. We find no evidence that the option was intended to be further compensation for the loan of money. The loan was made to release the stock so that it might be available in case the attempted refinancing was successful. The option represented the price at which Harriman would receive the stock. The difference between the option price and the price at which the stock might be marketed by Harriman represented its profit and compensation for its services. Harriman had no interest in purchasing this stock except as an incident to its attempted refinancing. The finding of the trial court that the loan made by Harriman was not usurious is amply supported by the evidence.

Both appellant and respondent raise numerous technical or minor points which require some discussion.

A judgment creditor's action as provided for in section 1189 of the Civil Practice Act, depends upon the return of execution

unsatisfied. Plaintiff's judgment against Winant was entered February 1, 1929. Execution issued to the sheriff on Saturday, February 2, 1929. This suit was brought the same day. The transcript of the judgment recites, " execution returned unsatisfied, filed Feb. 5, 1929." The sheriff's indorsement was made on February second. An order of the Supreme Court directed that the sheriff's return which was filed on February fifth should be refiled *nunc pro tunc* as of February second. The important question is not when the sheriff's return was filed, but when he made indorsement upon the execution. (See *Iselin* v. *Henlein,* 2 How. Pr. [N. S.] 211.) The point made, however, is not important since it applies only to the cause of action set forth in the original complaint which was rightly resolved in favor of the defendant. As for the necessity of a judgment to maintain the cause of action set out in the supplemental complaint, based on article 10 of the Debtor and Creditor Law (as added by Laws of 1925, chap. 254), the Court of Appeals has held that a judgment is not a prerequisite. (See *American Surety Co.* v. *Conner,* 251 N. Y. 1.)

The second point to be considered is whether the plaintiffs may maintain this suit because of their own refusal to do equity. This argument is based on the theory that plaintiffs wrongfully prevented a public sale by threatening to warn purchasers that good title could not be given by the seller. Finding 64 states that the proposed announcement was wrongful and wholly without justification. The further argument is made that the plaintiffs should have taken up Harriman's loan, either in whole or in part, and assisted in bearing the burden. Plaintiffs were under no duty to assist Harriman in liquidating its loan or to share in the liability. As for the threat to announce that a good title could not be given, assuming that it was inequitable before February fifth to do anything to prevent the borrower from foreclosing the pledge, damage arising therefrom would constitute a claim for a particular tort and would not serve as a defense to plaintiffs' claim that the transfer of February fifth was in fraud of creditors. There is no showing that anybody intended to buy at the sale other than Harriman itself, and Harriman's purchase would have been in no wise affected by the threats.

The third point to be considered is the claim of defendants that a judgment creditor's action does not lie for a transfer of the shares of Falcon Oil Corporation because Winant was never personally the owner of the 450,000 shares which he pledged. Literally, this is true, but throughout the transactions he treated the Falcon Oil Corporation stock as his own and pledged it whenever it seemed

best, although he was perhaps technically acting as the manager of V. N. P. C. which corporation or its nominees "owned" the Falcon Oil Corporation shares. The fact that the other stockholders of V. N. P. C. gave Winant full authority over the shares leads inescapably to the conclusion that for purposes of enforcing personal claims against Winant, all questions of corporate entities must be disregarded. Not only did Winant himself disregard them but Harriman also, as the bailee of collateral furnished by Winant and as the transferee of the stock transferred by Winant, disregarded them and cannot question Winant's authority or ownership More-over, the effect of the transfer of February fifth was to divest V. N. P. C. of all its property and render it insolvent. The stock in V. N. P. C. was substantially everything that Winant owned. Therefore, it cannot be seriously contended that plaintiffs have failed to prove that Winant was in fact, if not in form, the owner of the shares of Falcon Oil Corporation stock.

The return of execution unsatisfied against Winant was *prima facie* evidence of his insolvency and the burden of going forward to show that Winant retained sufficient other property to pay his debt was not borne by the defendant. (*Canaday* v. *Arch Amusement Co., Inc.*, 179 App. Div. 842, 843; *Cole* v. *Tyler*, 65 N. Y. 73, 78; *Ga Nun* v. *Palmer*, 216 id. 603, 611.)

It is next claimed that in view of the later transfer of stock of the V. N. P. C. to the plaintiffs, the plaintiffs have failed to prove that the judgment remains unpaid. While there is perhaps nothing in the record to show the value of these shares directly, the only property that V. N. P. C. ever owned was the royalty and concession which it exchanged for the pledged shares of Falcon Oil Corporation stock. The insolvency of V. N. P. C. has been sufficiently proved by the transfer itself and the further inference is inevitable that stock in the company is worthless.

Finally, the situs of the contract of August twenty-ninth was litigated. In our view, the situs is unimportant since we think that the loan was not usurious by either New York or English law. The evidence, however, did not support the finding that the agreement was made in England. The only reasonable inference is that the parties made every effort to contract in New York, since, having an opportunity of signing the agreement in London, Winant authorized his agent in New York to execute it for him in this forum.

There remains for consideration the issue tendered in the supplemental complaint. The facts surrounding the transfer of property of February fifth are pleaded. It is alleged that Winant at the time was hopelessly insolvent, that the insolvency was known to

Harriman, that there was no present consideration for the transfer, and that the shares were not sold at public auction. Plaintiffs pray that the agreement of transfer be adjudged fraudulent and that it be rescinded.

The cause of action just set forth is controlled by the provisions of article 10 (§§ 270–281) of the Debtor and Creditor Law, covering fraudulent conveyances. " A person is insolvent when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured." (§ 271.) " Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration." (§ 273.) " Fair consideration is given for property, or obligation,

" a. When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or

" b. When such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained." (§ 272.) " Where a conveyance * * * is fraudulent as to a creditor, such creditor, when his claim has matured, may, as against any person except a purchaser for fair consideration without knowledge of the fraud at the time of the purchase * * *

" a. Have the conveyance set aside or obligation annulled to the extent necessary to satisfy his claim." (§ 278.)

It seems to us that the transfer of February fifth did render Winant insolvent, that the claim of the plaintiffs had matured, and that they are entitled to the relief demanded unless the transfer was in exchange for a " fair consideration." We also think that a distinction is made in the statute between property transferred to *secure* an antecedent debt and property transferred to *satisfy* an antecedent debt. A creditor in Harriman's position may take any amount of the debtor's property as security for an antecedent debt so long as the amount of the debt is " not disproportionately small as compared with the value of the property." But when such a creditor takes property in satisfaction of an antecedent debt, the property must be no more than a " fair equivalent." There is thus presented for determination the fair value on February fifth of the 450,000 shares transferred.

This is not a case involving a transfer of property having a purely speculative value where no basis exists for determining the relation

between its value and the debt. This stock, while not readily salable in such quantity as was involved in this transfer, had at all times a clear ascertainable value. The company was engaged in active operation of a part of its property and had a record of some nineteen months of business experience. It owned physical properties purchased at comparatively recent dates, principally for cash. These properties had been the subject of extended geological investigations and reports by experts. With these indications of value available, a comparison between the debt and the value of the property transferred can readily be made. The court below made no specific finding of the monetary value of this stock. This necessitates an examination of the evidence on that subject.

One indication of value is that shown by a capitalization of net earnings. The value of this stock arrived at by capitalizing the company's net earnings on operations up to January 31, 1929, on a ten per cent basis is $7.70 a share. The net earnings, after deducting overhead, amounted to seventy-seven cents per share. This amount does not take into consideration the undeveloped " concession " oil lands in Venezuela for which $1,340,000 had been paid in cash and $175,000 in stock. The actual cash invested in the " concession " properties amounted to approximately $2 a share and upon this very conservative basis a total value of approximately $9.70 is reached.

Harriman's idea of the minimum value of this stock is clearly shown by the various option agreements. The option prices fixed by these agreements range from $7 a share for a small quantity of stock to $10 a share. The option of August thirty-first fixed the price at $7.50 a share for 350,000 shares until December thirty-first or until the loan was paid and at $9 a share for a period of six months after repayment of the loan. These prices clearly show that up to a short time prior to the transfer, Harriman considered that this stock had a minimum value of $7.50 a share.

The value of this stock is further evidenced by the price at which it was sold by Harriman to the Spanish company about six months after the transfer. This price represents approximately $9.14 a share for the entire 680,000 shares outstanding. Even after deducting an allowance for the $200,000 paid for the modification of the Lago agreement, a net value as high as $8.84 is left. These figures are criticised upon the ground that oil was considerably higher at the time this contract was entered into, but at the time the Spanish contract was ratified the price of oil was as low as it was at the time of the transfer on February fifth.

A geological valuation of the estimated oil in the properties as of December, 1928, contained in the so-called Brokaw report,

showed that the capital stock was worth about $8.42 a share, and the court has so found. The report and the testimony of defendant's expert were so contradictory and unsatisfactory as to be worthy of no consideration in this connection.

The book value of the stock as found by the court was in excess of ten dollars a share. No exception was taken to this finding and while defendant questions its accuracy on this appeal, it correctly states the value as shown by the books and the attempted criticisms are without merit.

The court has found " that the 450,000 shares of the capital stock of the Falcon Oil Corporation were transferred to the defendant W. A. Harriman & Co., Inc., for a fair consideration." This finding while conclusory in its nature may be considered sufficient under the statute. (*Watson* v. *Goldstein*, 174 Minn. 423.) It is, therefore, unnecessary to send the case back to the trial court for a specific finding as to the actual value of the property on February fifth. (*Smith* v. *Geiger*, 202 N. Y. 306, 311.) The finding, however, cannot stand unless the evidence of value supports it. A fair consideration of the estimates of value of this stock hereinbefore referred to, convinces us that at the time of the transfer it had a value of at least $7.50 a share, as contrasted with the price of about $5.98 per share at which it was taken over by Harriman. The difference between these figures is most substantial. The par value of this stock was only $10 a share. Allowing Harriman the full value of his loan with interest, approximately $675,000 remains unaccounted for. The debt due Harriman did not constitute a fair consideration for the transfer which was made to it, and the contrary finding by the trial court must be reversed. The transfer was, therefore, made in fraud of the plaintiffs within the meaning of the sections of the Debtor and Creditor Law hereinbefore referred to.

The final question is whether, in view of the fact that Harriman has concededly conveyed the shares received on the transfer to foreign purchasers and has received an equivalent consideration, a money judgment in this equity suit against Harriman is proper. Section 278 of the Debtor and Creditor Law (*supra*) provides that the plaintiff may have the conveyance set aside or the obligation annulled to the extent necessary to satisfy his claim. Merely setting aside the conveyance and annulling the obligation would be of no avail in this instance. Under section 280 of the Debtor and Creditor Law, " In any case not provided for in this article the rules of law and equity * * * shall govern." A court of equity has the power to adapt its relief to the exigencies of the case and may award a personal judgment against a party in lieu

of setting aside a transfer where the facts establish such a personal liability. (*Fox* v. *Erbe*, 100 App. Div. 343, 349.) That decision merely reiterated the holdings in other judgment creditor actions. (*Murtha* v. *Curley*, 90 N. Y. 372; *Baily* v. *Hornthal*, 154 id. 648.) A money judgment in favor of the plaintiffs is, therefore, proper. There is no need for a reference for an accounting since the facts are all before us.

The judgment should be reversed, with costs and disbursements, and judgment directed for the plaintiffs for $306,021.86, with interest and costs.

FINCH, P. J., and MERRELL, J., concur; O'MALLEY and SHERMAN, JJ., dissent.

SHERMAN, J. (dissenting). The finding below that the transfer on February 5, 1929, of the 450,000 shares of Falcon Oil Company stock to respondent was for a "fair consideration" within the meaning of the provisions of the Debtor and Creditor Law (§ 272) is, as I view the testimony, well supported in the evidence.

The fairness of the consideration must be judged in the light of the surrounding conditions, then present, and is not to be tested by a subsequent happening, which could not then have been forecast.

The consolidated loan of $2,600,000 and interest, held by respondent, against which the shares had been pledged, was long overdue and Winant had unavailingly attempted to sell the collateral. He was vitally interested in so doing in order to avert a deficiency judgment.

Respondent did not seek to acquire these shares. It had rejected Winant's offer to transfer them in satisfaction of the debt and had advertised the shares for public sale. Plaintiffs prevented that sale by their threat to proclaim that the purchaser could not obtain a valid title — conduct found to be wrongful and without justification. Having carried the loan for a long period of time, respondent requested plaintiffs and other known creditors of Winant to take the whole or any part of its position offering to lend the money to plaintiffs to the extent required to make the purchase. Plaintiffs, however, stated that they already had all the Falcon stock that they wished. They do not deny that they were acquainted with the assets of the corporation and were in a position to know their value. They did nothing beyond instituting this action based, at its start, upon the unfounded claim, still pressed upon our attention, that the loan was usurious and should be held void. They, not Winant, the borrower, pursued this course whereby they sought to put all the stock in such position that they could satisfy their claim out of the shares, freed from the lien of the indebtedness due to Harriman. If, as now contended, that stock

was then actually worth seven dollars and fifty cents per share, appellants were strangely blind to that fact when they refused to participate at the lower price.

W. A. Harriman & Co. was in a difficult position. It made the loan in good faith to aid the enterprise and dealt fairly. As found by the court, it followed no fraudulent course. Then, to protect itself, it took over the shares against the debt.

Was there any market for the stock at which it could have been sold at a better price than Hariman paid for it? Neither plaintiffs nor other shareholders were willing to take any part of these shares at the price that Harriman paid. The purchase was made at a figure slightly under six dollars per share. There is no proof that the shares ever sold above six dollars per share. Book values are referred to, as though they constituted a guide. But they are of no consequence here, because they had been written up in the company's books by mere bookkeeping entries to enormously exaggerated figures. Whether or not the Falcon Oil Corporation had operated at a profit during the brief period of nineteen months, with oil selling at a fairly high price, is extremely doubtful and depends upon the proper allowance to be made for depreciation and depletion. The option prices, mentioned in the borrowing agreement, reveal the early hopes of the parties engaged in this speculative operation. No one at any time considered exercising them. The opinion of experts as to how much oil there might be underground and its possible worth were mere guesses.

The important factor is that there was no one prior to, or at that time, who would buy these shares, in whole or in part, at the price paid by W. A. Harriman & Co. How then can it be held that the consideration of approximately $5.95 per share (the loan with interest then aggregating about $2,675,000) was actually unfair, unless this court, knowing that no one would, holds that some one should, have paid more?

Harriman & Co. had a lien on the shares pledged for the loan. It had been unable to persuade plaintiffs or any creditor of Winant, to take over any part of the loan, because these creditors evidently did not regard the lien as being sufficiently secured by the then value of the stock and deemed the options worthless.

Several months passed during which these shares were offered for sale with no purchaser. Respondent negotiated for and obtained a change in the long term oil contract, which was Falcon Corporation's most valuable asset, at an added cost to it of $200,000. Then, only, was it fortunate enough to find a purchaser. Without this change procured by the further investment of $200,000, none could be found. Respondent might have lost its entire investment.

It took all the risk. Fair consideration is not synonymous with the highest price. Consideration may be fair even if somewhat less than full value. Here, it measured the full value.

Under the circumstances, the transfer of these shares in satisfaction of the antecedent debt, with a release to Winant and forbearance to sue him for a deficiency was upon an adequate consideration which was " fair " under section 272 of the Debtor and Creditor Law.

The judgment appealed from should be affirmed, with costs.

O'MALLEY, J., concurs.

Judgment reversed, with costs and disbursements, and judgment directed for the plaintiffs for $306,021.86, with interest and costs. The findings inconsistent with this determination should be reversed and such new findings made of facts proved upon the trial as are necessary to sustain the judgment hereby awarded. Settle order on notice.